887 So.2d 118 (2004)
STATE of Louisiana
v.
Oscar MYLES.
No. 04-KA-434.
Court of Appeal of Louisiana, Fifth Circuit.
October 12, 2004.
*120 Bruce G. Whittaker, New Orleans, Louisiana, for Appellant, Oscar Myles, III.
Oscar Myles, III, Allen Correctional Center, Kinder, Louisiana, in Proper Person.
Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Appellate Counsel, Ralph C. Cox, III, Trial Counsel, Assistant District Attorneys, Gretna, Louisiana, for Appellee, State of Louisiana.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
On January 15, 2003, the Jefferson Parish District Attorney's Office filed a bill of information charging the defendant, Oscar Myles, with molestation of a juvenile, a violation of La. R.S. 14:81.2. The defendant was arraigned on January 16, 2003, and pled not guilty.
On May 15, 2003, the six-member jury returned a verdict of guilty as charged. On June 4, 2003, the trial court denied the defendant's Motion for New Trial and sentenced the defendant to four years at hard labor with credit for time served. On the same day, the State filed a multiple offender bill of information alleging that defendant was a fourth-felony offender and defendant denied the allegations. The trial court also granted defendant's motion for appeal.
On August 20, 2003, after the hearing on the multiple-offender bill of information, the trial court found defendant to be a fourth offender. The trial judge then imposed an enhanced sentence on defendant of twenty years at hard labor "without benefits."[1] On the same day, the defendant filed a Motion to Reconsider Sentence. The defendant then filed another Motion for Appeal to include *121 the multiple-offender finding and sentence.

FACTS
On November 11, 2002, Officer Corey Newby of the Gretna Police Department responded to a domestic disturbance at 710 Cook Street in Gretna. When Officer Newby arrived, he learned that a woman had stabbed her boyfriend. Officer Newby testified that, after the woman, J.W.,[2] was arrested, she told Officer Newby that she wanted to leave her three children with her neighbor, Oscar Myles. Officer Newby testified that he went to the woman's apartment, found Myles in the apartment with two boys and a girl, alerted Oscar Myles of the woman's request, and documented Myles' information for his police report. Officer Newby also testified that, before he left the complex's parking lot, he saw the two boys that had been in the woman's apartment run down the breezeway to another apartment in the complex.
At trial, B.W., the eleven-year-old victim, testified that on the night her mother was arrested, the defendant waited about ten minutes after the policeman left her apartment then sent B.W.'s brothers to his apartment to watch television. After her brothers left, defendant locked the front door to the apartment then went into the bathroom. When he returned, he knelt in front of her as she was watching television and started kissing her on the lips. Next, he picked her legs up, laid her on her back on the couch, pulled down her pajama pants and underwear, then laid on top of her with his pants at his knees. He continued to kiss her mouth. He then touched and kissed her chest. He also touched her with his fingers on the outside and inside of her "private part area," which hurt badly. When defendant asked her if she wanted him to stop, she responded "yes." He kissed her again then got up and pulled up his pants. She testified that she quickly pulled up her underwear and pants. When defendant unlocked and opened the front door, she heard "Kristi" ask defendant why he was in the apartment "alone with a female." Her brothers arrived back at their apartment and "Kristi" stayed with them.
Kristi Kordys, the assistant manager of the apartment complex, testified that she knew the children's mother had been arrested so she went to their apartment to check on them. As she arrived, she saw the boys walking toward their apartment and saw Oscar Myles at the front door of the victim's apartment. Kordys also saw the victim standing inside the apartment near the doorway. Kordys remembered that the victim was wearing very loose pants, which she was clutching at the waist. She could tell that the drawstring on the pants was not tied.
Kordys stated that she confronted Myles about the propriety of being alone in the apartment with B.W. and he informed her that J.W. had left him in charge of her children. He then told Kordys that he was helping B.W. look for "paperwork" to help get J.W. out of jail. Kordys, on the apartment manager's instruction, stayed with the children at that point, got them ready for bed, and locked them into their apartment.
In the early morning hours of November 12, 2002, A.W., the children's maternal aunt, picked them up and brought them to her house. She testified that the children immediately went to bed after they arrived *122 at her house. A.W. learned that, while she was at work the next day, B.W. just stayed in bed with the covers over her head. She did not eat that day. Later that evening, B.W. would not leave her room to watch videos with the family.
When B.W.'s great-uncle, I.T., called that evening, he told A.W. to find out if the children had been separated after their mother was arrested. As soon as her brothers admitted that they were separated, B.W. hung her head and got quiet. B.W.'s aunt asked the boys to leave and questioned B.W. alone. Initially, B.W. did not respond to any of her questions, except to say that she was separated from her brothers. B.W. testified that she felt ashamed and did not tell her aunt what happened until later, seven or eight that night.
Eventually, B.W. told her aunt that the defendant pulled her pants down, touched her breast, and put his fingers inside of her. A.W. immediately took B.W. to Lakeland Medical Center. Officer Newby of the Gretna Police Department, who had earlier arrested B.W.'s mother, came to Lakeland to interview B.W., and then escorted them to Children's Hospital. At Children's Hospital, Dr. Albert Baker, an emergency room physician, performed a forensic examination on B.W. to test for sexual abuse. During the forensic examination, Dr. Baker performed a general physical exam and pelvic exam. He also collected fluid and blood samples. According to Dr. Baker, the results of the exams and tests were unremarkable. Dr. Baker opined that it was not unusual that an eleven-year-old female who was digitally penetrated by an adult male would not have significant findings during a physical exam.
Omalee Gordon, a forensic interviewer with the Jefferson Parish Children's Advocacy Center, testified that she interviewed B.W. about the incident. Their interview, which was videotaped, was played for the jury.
Dr. Scott Benton, who is Director of the Pediatric Emergency Medicine Program at the Children At Risk Evaluation Center of Children's Hospital, was accepted as an expert in the field of pediatric forensic medicine. He testified that it was not surprising that nothing remarkable was found in B.W.'s examination because at her age the hymen is "stretchy" so there would be minimal residual trauma unless there was undue force or a unique situation. In addition, her lack of resistance further lessened the probability of trauma.
He testified that, in his experience, it is very rare that a child comes forward immediately after a sexual abuse incident. Children in the age range of B.W., less than twelve, delay reporting the rape for three major reasons: lack of understanding, shame, and implicit or explicit threatened consequences for reporting. Dr. Benton also testified that it is not unusual for children to have sequential/delayed disclosures, adding different or newer things over time creating a cumulative victim experience. In addition, Dr. Benton testified that the demeanor of a child is not an accurate predictor of her veracity or what she has experienced. Dr. Benton testified that there was no way to tell based on physical science whether B.W. was molested. He stated that the question of whether it was more or less likely to have happened was a question he was reluctant to answer; rather it was one for the jury.
The defendant, Oscar Myles, testified that he knew the victim's family because they went to the same church and lived in the same apartment complex. He testified that, on the night that J.W. was arrested, he saw J.W. and her boyfriend fighting when he arrived home from work. He *123 stayed in the apartment's courtyard to help J.W. in the event her boyfriend became violent. He testified that he had not eaten his dinner yet and, because he did not yet have electricity in his apartment, he asked B.W. to warm his dinner in their microwave while he waited in the courtyard.
After J.W. was arrested, defendant agreed to keep the children. He testified that he took B.W.'s brothers to his apartment to watch a football game. He requested that B.W. stay in her family's apartment to look for information to contact her relatives. He testified that, when he returned to B.W.'s apartment, he was going to eat his dinner while B.W. searched for "papers" to contact her relatives so he went into the restroom and washed his hands. He stated that, when B.W. could not find the information, he opened the apartment's front door to go find Kristi Kordys to help the children. The defendant testified that Kordys walked up and immediately asked him why he was in the apartment alone with B.W., and he replied that they were looking for information on a relative to contact.
On cross examination, when the prosecutor asked the defendant how the boys could watch television in his apartment if he had no electricity, he stated that he had run an extension cord from his neighbor's apartment for his television. He also testified that he had at least three felony convictions, including armed robbery, attempted possession of cocaine, and conspiracy to possess a fraudulent document. After hearing the testimony, the six-person jury unanimously found defendant guilty as charged.

DISCUSSION
In his first pro se assignment of error, defendant challenges the sufficiency of the evidence presented to convict him of molestation of a juvenile. He argues that the evidence was insufficient and circumstantial because State failed to introduce physical findings of sexual abuse.
The standard for appellate review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, 35.
A reviewing court may impinge on the fact-finding function of the jury only to the extent necessary to assure the Jackson standard of review. State v. Bordenave, 95-2328 (La.4/26/96), 678 So.2d 19, 20 (quoting Jackson, 443 U.S. at 319, 99 S.Ct. at 2789). It is not the function of an appellate court to assess credibility or reweigh the evidence. Appellate review for minimal constitutional sufficiency of evidence is a limited one restricted by the standard developed in Jackson. State v. Rosiere, 488 So.2d 965, 968 (La.1986) and the cases cited therein.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. State v. Stec, 99-633 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787. In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. State v. Hotoph, 99-243, p. 17 (La.App. 5 Cir. *124 11/10/99), 750 So.2d 1036, 1045, writ denied, 99-3477 (La.6/30/00), 765 So.2d 1062 and 765 So.2d 1066.
In the present case, defendant was convicted of molestation of a juvenile, a violation of La. R.S. 14:81.2, which provides, in pertinent part:
Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.
In this case, B.W. testified that, on the night her mother was arrested, defendant kissed her on her mouth, kissed her chest, touched her chest with his hands, removed her underwear and pants, and inserted his finger into her vagina. The record reflects that she was eleven years old and that defendant was 52 years old at the time of trial. While defendant asserts there was no medical evidence to support that B.W. was sexually assaulted, Dr. Benton testified he would not expect any physical signs of abuse where an adult male digitally penetrated an eleven-year-old girl. Accordingly, viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could have concluded beyond a reasonable doubt that defendant was guilty of molestation of a juvenile. See State v. Roca, 03-1076 (La.App. 5 Cir. 1/13/04), 866 So.2d 867, 874-876.
In his second pro se claim, defendant contends that "constitutional factors not considered increased defendant's punishment where the essential element was not proved beyond a reasonable doubt of the charged offense." Defendant cites Blakely v. Washington, ___ U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 in support of his argument that, "[b]ecause the State's sentencing procedure did not comply with the Sixth Amendment, petitioner[sic] sentence is invalid." (Emphasis in original.)
First, the general rule established by this Court is that issues not submitted to the trial court for decision will not be considered by the appellate court on appeal. Constitutional issues are no exception. Vallo v. Gayle Oil Co., 94-1238 (La.11/30/94), 646 So.2d 859. In an abundance of caution, we will consider the merits of this argument.
In Blakely, the United States Supreme Court applied the rule expressed in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000): "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Blakely, 124 S.Ct. at 2536. Here, defendant challenges his enhanced sentence. We read the Apprendi exception to apply to sentencing enhancements, such as the enhancement defendant challenges.
In his first counseled assignment of error, defendant argues, "It was error to permit an expert witness to totally usurp the role of the jury in judging the guilt or innocence of appellant." He specifically asserts that the trial court erred in permitting an expert to give opinions on the physical findings of the victim's medical examination and the victim's credibility regarding her delay in reporting the incident, the changes and discrepancies in her *125 story, and her demeanor. Defendant claims that the expert was allowed to impermissibly bolster the victim's testimony, and usurp the credibility determination of the child's testimony that is the province of the jury.
The purpose of an expert witness in a criminal case is to provide the jurors with a basis of knowledge and background information on a subject. The jury as the ultimate fact finder should relate background knowledge received from the expert to the facts established by the evidence at trial, and make a determination of the defendant's guilt. State v. Soler, 93-1042, p. 11 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1080, writ denied, 94-1361 (La.11/4/94), 644 So.2d 1055.
La. C.E. art. 702 provides that a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if the scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. La. C.E. art. 704 provides:
Testimony in the form of an opinion or inference other-wise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.
Expert testimony can assist a jury in understanding the significance of a child-witness's demeanor, inconsistent reports, delayed disclosure, reluctance to testify, and recantation. State v. Chauvin, 02-1188 (La.5/20/03), 846 So.2d 697. See also, State v. Foret, 628 So.2d 1116 (La.1993). An expert witness can explain to the jury that a child-witness's seemingly abnormal behavior such as delayed reporting, inconsistent statements, and recantation is normal for children who have been sexually abused and can also dispel jurors inaccurate perceptions allowing them to better assess a child-witness's testimony. State v. Chauvin, 846 So.2d at 702-703.
The proper presentation of the expert testimony must focus on explaining to a jury why "superficially bizarre" reactions such as delayed reporting, and the like take place in such cases. State v. Foret, 628 So.2d at 1130. See also, State v. Chauvin, supra; State v. Ste. Marie, 97-0168 (La.App. 3 Cir. 4/18/01), 801 So.2d 424, 428, appeal after remand on other grounds, 01-1253 (La.App. 3 Cir. 4/10/02), 824 So.2d 358, writ denied, 02-1117 (La.12/19/02), 835 So.2d 1288. The expert's opinion testimony must explain in general the behavioral characteristics of child abuse victims in disclosing alleged incidents without giving an opinion directly concerning the particular victim's credibility. State v. Foret, 628 So.2d at 1130; State v. Ste. Marie, 801 So.2d at 429.
If the expert's testimony is properly limited in this fashion, then it is of assistance to the jury in evaluating the psychological dynamics and resulting behavior patterns of alleged victims of child sexual abuse. State v. Foret, 628 So.2d at 1130. The expert's testimony concerning why victims might recant or delay reporting offered to rebut attacks on the victim's credibility is proper, so long as the expert limits his testimony to the general characteristics that explain delays in reporting, recantations, and omission of details. Id. The expert cannot substitute his estimation of the child's credibility for that of the jury. The expert testimony can only provide a scientific perspective for the jury to evaluate the child's testimony for itself. Id.
Expert testimony becomes problematic when it is unduly prejudicial causing the jury to give too much weight to the *126 expert's opinion stating medical conclusions drawn from diagnostic methods having limited merit as fact-finding devices, in order to determine the credibility of the victim and whether the sexual abuse has in fact occurred, since it bolsters a child-witness's testimony because of the reliability and trustworthiness associated with scientific or medical evidence. State v. Chauvin, 846 So.2d at 707. In short, the expert testimony on the victim's credibility is prejudicial when it puts an expert's stamp of truthfulness on the witness's testimony bolstering it artificially to increase its probative strength with the jury. State v. Foret, 628 So.2d at 1129.
In the present case, the defense objected to Dr. Benton giving an expert opinion about a victim that he had not examined and about "how a child who has been sexually assaulted should react either at the hospital upon exam" or when they testify in court. Defense counsel claimed that the State was trying to qualify Dr. Benton "as an expert to tell the jury that they're suppose to believe what this young lady testified to, and the manner she testified to," instead of leaving the credibility determination to the jury. The trial court found that the question was appropriate for an expert witness to allow an expert opinion that might assist the trier of fact.
At trial, Dr. Benton testified that a child's behavior is not predictable and that it would be unwise to draw conclusions about the veracity of B.W.'s statements based solely on her demeanor. When asked if he could draw any conclusions based on B.W.'s behavior the day after the assault, Dr. Benton responded that the victim's aunt seemed to have been an accurate describer of some behaviors that were abnormal for an eleven-year-old child. He declined to comment on whether B.W.'s behavior was abnormal or, if so, what caused it since he had not witnessed her behavior. He opined that, based upon B.W.'s history and testimony, B.W. had a multitude of potential reasons for exhibiting these behaviors, including her mother's arrest, witnessing domestic violence, and her allegations of sexual assault. Dr. Benton was unwilling to draw any conclusions as to her behavior but felt it warranted further exploration. Dr. Benton agreed that the ultimate question of whether B.W. was molested was for the jury.
In this case, Dr. Benton's testimony included a general opinion on the physical signs one might see in a sexual abuse examination of a victim in B.W.'s age range. Dr. Benton testified that there was no way to tell purely based on physical science whether B.W. was molested. Dr. Benton refused to give an opinion on the credibility of B.W.'s allegations and testimony.
Dr. Benton gave a description of general behavioral traits in sexually abused children, and testified that delayed reporting of certain events was not atypical for any child of the defendant's age, who had been sexually abused. Under State v. Chauvin, supra and State v. Foret, supra, this testimony is admissible. Further, his testimony was properly limited to general behavioral characteristics of child abuse victims in disclosing alleged incidents, specifically why victims might recant or delay reporting, which is proper to rebut attacks on the victim's credibility. State v. Ste. Marie, supra. His testimony only gave assistance to the jury in evaluating the psychological dynamics and resulting behavior patterns of alleged victims of child sexual abuse. Id. This assignment of error lacks merit.
In his second counseled assignment of error, the defendant requests a review of the record for all errors patent. As is our practice under La.C.Cr.P. art. 920, we have reviewed the record for errors patent. *127 We note the following matters, which require corrective action.
First, after the August 20, 2003 multiple offender hearing, the trial judge, who found that defendant was a fourth felony offender, imposed an enhanced sentence of twenty years at hard labor "without benefits." La. R.S. 15:529.1(G) requires that the defendant's multiple offender sentence be served without benefit of probation or suspension of sentence; the statute makes no mention of parole ineligibility. Because "without benefits" is ambiguous, and could be interpreted to mean that parole eligibility is also excluded, the sentence may be illegal. La.C.Cr.P. art. 882 allows this Court to correct an illegal sentence "at any time." Therefore, we amend defendant's multiple offender sentence to be served without benefit of probation or suspension of sentence. See, State v. Sanders, 04-17 (La. 5), 876 So.2d 42.
Second, the defendant was convicted of molestation of a juvenile, a violation of La. R.S. 14:81.2, which is defined by La. R.S. 15:541(14.1) as a sex offense. Further, because the victim was eleven years old at the time of the offense, defendant is required to register as a child predator under La. R.S. 15:542.1. See La. R.S. 15:541(9). In this case, the record does not reflect that the trial court provided the defendant with notification of sex offender registration requirements. Therefore, we remand with instructions to the trial court to send the defendant appropriate written notification of the registration requirements of La. R.S. 15:542.1 and file written proof that defendant received the notice in the record.
Third, we have reviewed defendant's original and enhanced sentencing transcripts and found that the trial court did not properly advise the defendant of the prescriptive period for filing an application for post-conviction relief. We remand, therefore, with instructions to inform the defendant of the provisions of La. C.Cr.P. art. 930.8 by sending appropriate written notice to the defendant and to file written proof that defendant received that notice in the record. State v. Hutchinson, 02-60, p. 10 (La.App. 5 Cir. 5/15/02), 817 So.2d 500, 509.
AFFIRMED AND REMANDED.
NOTES
[1] See the Error Patent Discussion.
[2] In accordance with La. R.S. 46:1844(3), this Court will refer to the victim and her family by their initials to protect the victim's identity. State v. Simmons, 03-20, p. 2 (La.App. 5 Cir. 4/29/03), 845 So.2d 1249, 1251.