948 So.2d 199 (2006)
STATE of Louisiana
v.
Ronald J. MORGAN.
No. 06-KA-529.
Court of Appeal of Louisiana, Fifth Circuit.
December 12, 2006.
*201 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Andrea F. Long, Martin A. Bellanger, Jr., Kia M. Habisreitinger, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Jane L. Beebe, Attorney at Law, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On September 4, 2003, the Jefferson Parish Grand Jury returned an indictment charging defendant, Ronald J. Morgan, with aggravated incest in violation of LSA-R.S. 14:78.1 and aggravated rape in violation of LSA-R.S. 14:42.[1] Defendant *202 was arraigned on September 8, 2003 and pled not guilty. On January 20, 2005, the trial judge granted the state's motion in limine which prohibited any evidence at trial of the victim's sexually transmitted diseases or other sexual partners. Defendant filed a writ application with this Court that was denied.[2]
On January 25, 2005, after defendant waived his right to a jury trial, the case was tried before the judge who found defendant guilty of the lesser charge of forcible rape instead of aggravated rape and guilty as charged of aggravated incest. On June 27, 2005, defendant timely filed a motion for new trial.[3] The trial court sentenced defendant on July 11, 2005 to imprisonment at hard labor for 20 years on the forcible rape conviction with the first two years to be served without benefit of parole, probation, or suspension of sentence and 10 years on the aggravated incest conviction with the sentences to run concurrently. On that same date, the state filed a multiple bill alleging defendant to be a third felony offender, and defendant denied the allegations of the multiple bill. The state advised the trial court that the multiple bill was filed on both counts. The trial court found defendant to be a third felony offender on October 24, 2005.
On November 16, 2005, the trial court denied defendant's untimely filed pro se "motion for post-verdict judgment of acquittal alternatively motion for new trial." On that same date, defendant waived sentencing delays, and the trial court sentenced defendant under the multiple bill statute to imprisonment at hard labor for 40 years without benefit of probation or suspension of sentence on both counts to run concurrently.[4] Defendant filed a motion for appeal that was granted.
FACTS
D.M., defendant's biological daughter, testified at trial that, starting when she was approximately 10 or 11 years old and in the fourth or fifth grade, her father had simulated sex with her when she lived with him, his wife, and his three stepchildren and her sister, S.M., on Betty Street in the Marrero projects.[5] She further testified that her father engaged in those acts with her for two years every other night or whenever he wanted while other people in the home were sleeping.
*203 D.M. explained that she slept on a sofa bed with S.M., and that her father would wake her (D.M.) up, force her to get on the other sofa, lie on top of her facing her while they were clothed, and start "humping" her as if they were having sex. D.M. testified that she would tell her father to stop, but he would say, "[c]ome on, D.M." She added that he would not stop "humping" her unless he heard someone coming. D.M. thought her sister saw her father on top of her one night, but when her sister did not get up or do anything, she thought she was mistaken. D.M. testified that she left her father's home and went and lived with her mother after her fifth grade year. She stated that she completed half of sixth grade while living there, got expelled, and did not finish school that year.
D.M. explained that she then moved back with her father on Burnlee Street in Marrero and repeated the sixth grade while living with him, and that she stayed there for two more years. She indicated that, when she moved back in with her father, her father's family was still living there, but her sister, S.M., was not. D.M. testified that her father started having sexual intercourse with her when she moved back in with him the second time; however, she could not remember when it started. She further testified that her father forced her to have sexual intercourse with him throughout the two years she stayed with him, and that there was never a time that it stopped.
D.M. asserted that she would come home from school at 2:00 or 3:00 p.m., that defendant got off work at approximately 3:00 or 4:00 p.m., and that defendant's wife would not get off work until 7:00 p.m. She further testified that defendant would say, "[c]ome here, D.M.; come on let's do it before somebody get home." D.M. maintained that this occurred every other day or night and that it would happen in the living room, in his bedroom, or in the bedroom of L., her stepbrother. D.M. explained that from L.'s room, they could see who was about to walk in the front door.
D.M. described ways she would try to avoid having sex with her father: she would run into the bathroom and lock herself inside; however, her father would open the bathroom door with a kitchen knife; she would lie and tell him she had her period; she would wrestle with him when he tried to take off her clothes; she would kick him; and she would tell him to stop and leave her alone. She testified that she tried to resist, but her father was a heavy man and that his weight would pin her down. She added that, if she ran or hid, her father would tell her she would be punished, or she would not be able to talk on the phone or go to the movies or go outside. She stated that she never got punished because every time her father wanted to have sex with her, he had it. D.M. felt that if she did not have sex with her father, he would hurt her.
D.M. was positive that the last time her father had sex with her was the morning of a wedding. She could not remember the exact date of the wedding but knew it was in the summertime. She testified that her father picked her up from her Aunt K.H.'s house that morning and took her to his house on the pretense that he had something to talk to her about. They subsequently went to pick up his shoes and his tuxedo at a place off of Lapalco or the Westbank Expressway and then went to her cousin's house for a short while. She recalled that she also went to a friend of her father's that morning to pick up money so her father could purchase his wedding attire.
D.M. could not recall if her father had sex with her before or after they went to her cousin's house. She remembered that *204 she was looking behind the bar for her letters and diary when her father said, "[c]ome on D.M., let's do it so we can go." D.M. testified that the two of them were alone in the house, and that her father had sex with her on the living room floor. She said that it happened in the morning because they had a lot of errands to run in the afternoon.
D.M. testified that, on July 11, 2003, either the day of the wedding or right after it, she was having a conversation with her mother on the telephone when she told her mother she did not want to live with her father any longer. When her mother asked her why, D.M. started crying and told her that her father had been having sex with her. D.M.'s mother told D.M. she was on her way. D.M. subsequently met with police officers, and she was examined by a doctor at Children's Hospital.
C.A., D.M.'s mother, testified at trial that she sent D.M. to live with her father because she had problems with D.M. being disrespectful and rebellious. C.A. explained that, after D.M. told her about the molestation, C.A. went to K.H.'s house to call Jefferson Parish and make the complaint since the actions occurred in that parish. C.A. indicated that when defendant got to K.H.'s house, he tried to speak to D.M. alone but she would not let him. C.A. also stated that defendant called twice to speak to D.M.
C.A. testified that defendant asked her what was going on, and that she lied and told him she was tired of the problems she was having with D.M. and that she was going to put her in a juvenile home, something C.A. and defendant had threatened D.M. with in the past. Defendant told C.A. not to do that, and that D.M. could come and live with him. C.A. recalled that defendant wanted to put D.M. on birth control when she was 14-years-old, but C.A. refused, saying that D.M. did not need it and was too young for it. C.A. testified that her relationship with D.M. was much better now that everything was "out in the open."
S.M. testified that, when she was 9 or 10 years old and living with her father and D.M. on Betty Street in Marrero in 1999 or 2000, she heard the door shut which woke her up early one morning, at approximately 6:30 or 7:00 a.m. When she turned around, she saw her father lying on top of D.M. on the sofa. She wondered why her father was doing that and turned her head back the other way because she did not want to look at that anymore. When she looked back again, the screen door opened and her father's wife came in, so he jumped up and went outside. S.M. went back to sleep as if she did not see anything, and she did not think either of them saw her observe them. S.M. recalled that she was approximately four feet away when she observed them, and that both her father and D.M. were wearing clothes at the time. S.M. also recalled that this occurred when her father's wife had gone outside to warm up the car before she went to work.
Dr. Scott Benton, a qualified expert in the field of forensic pediatric medicine, testified that that there were three reasons why it is unusual for children to disclose sexual assault right away: 1) they are naïve and do not know they can disclose; 2) external reasons such as threats or bribes; and 3) internal reasons such as embarrassment or being afraid of the consequences or feeling at fault or to blame for the activity. He indicated that children are led into sexual activity over time, and that it escalates to where the child is participating in the behavior and led to believe they have control over it. He also stated that it was common for a child to report some things to one person and other *205 things to another, and that it was the reason they conducted serial interviews.
Dr. Benton testified that D.M. was seen at Children's Hospital by his then senior fellow, Dr. Merrimer Porales, on August 20, 2003. After Dr. Benton reviewed the records and the audiotape of the conversation between Dr. Porales and D.M., he found that the history given was clear and detailed, and that the physical exam was within normal limits. Dr. Benton stated that the normal physical exam did not mean that defendant did not have sex with D.M. because the last contact reported was a month or two prior to the exam. He added that D.M.'s story was consistent with sexual abuse.
Deputy Tracey Wine of the Jefferson Parish Sheriff's Office (JPSO) testified that, on July 11, 2003, she responded to a call regarding a juvenile saying that her father was repeatedly raping her. When she approached the residence, she saw defendant, who appeared to her to be nervous, and several other subjects standing outside. She walked in and met with D.M. and her mother in a back bedroom. According to Wine, D.M. told her that her father had raped her before a wedding at approximately 10:00 a.m., and that she did not tell anyone before because her father had a bad temper and she was scared of what he might do. When she went outside to talk to defendant, he was gone. Wine testified that defendant called C.A. several times wanting to know why Wine was there, what it was about, whether it was about him, and what D.M. was telling Wine. Wine indicated that D.M. was crying, very scared, and almost hysterical. After speaking with D.M. and her mother, Wine notified the sergeant on duty and Detective Cummings.
JPSO Detective Michael Cummings testified that he spoke to D.M. and her mother, and took an audiotaped statement from D.M. Cummings believed it was significant that the situation started with simulated sex and progressed to rape. He explained that that was referred to as the "grooming process" in which a pedophile started with less serious offenses against a child, and as the child continued not to resist or the perpetrator continued to be successful in completing those acts, the severity would increase over time. Cummings testified that that was consistent with what D.M. told him.
After the state rested, the defense called K.H., defendant's sister, as a witness. K.H. testified that D.M. spent the night before the wedding at her house. She indicated that she first saw D.M. the morning of the wedding at 8:00 a.m. sleeping in bed with K.H.'s daughter. K.H. recalled that she then went to Winn Dixie and came right back, and that between 9:00 and 11:30 a.m., D.M. was at her (K.H.'s) house. K.H. admitted that she was not watching D.M. the entire time.
Paula Crawford, a long-time friend of defendant, testified that defendant got to her house at 10:00 a.m. on the morning of the wedding, and that a little afterwards they went to her friend's house and then to Westwego to pick up defendant's suit for the wedding.[6] She further testified that they returned to her house at 11:45 a.m. and that defendant then left to go and bring back his boss' truck. Crawford recalled that defendant's suit had previously been paid for.
L.O., defendant's stepdaughter, testified that she did not hear anything unusual during the night that would have caused her to be suspicious when D.M. was living with her and her family. She remembered *206 that her bed was not that far from the sofa when she lived on Betty and Burnlee Streets. L.O. indicated that defendant never tried to molest her.
A.M., defendant's wife and D.M.'s stepmother, testified that she too never heard anything in the night that would lead her to believe something suspicious was happening. She indicated that there was never a time when she came back inside after closing the screen door and noticed defendant on the sofa bed. She remembered giving defendant money to pay for his suit on the day of the wedding. A.M. could not account for defendant's whereabouts from 6:00 a.m. to 7:00 p.m. the day of the wedding, as she did not get off work until 7:10 p.m.
Delva Caliste testified that she got married on June 20, 2003, and that defendant attended her wedding.
K.H., A.M., M.S. (defendant's mother), and C.R. (defendant's sister) all testified that D.M. had problems with her mother, C.A.A.M. and M.S. indicated that D.M. was disrespectful and disobedient, and K.H. and C.R. recalled that they would go and pick up D.M. at C.A.'s request.
Earl Williams testified that when he was 20 or 21 years old, he and his friend would go to T.T.'s house when D.M. and T.T. were there, and that T.T.'s mother was not present sometimes.[7]
Defendant denied having either simulated sex or sexual intercourse with D.M. He contended that she made up those allegations because she wanted to be an adult and do what she wanted to do, but that he would not allow it and would put her in a juvenile home first. Defendant testified that he could not have raped D.M. at 10:00 a.m. on the day of the wedding. He asserted that, on that day, he got off work at 9:00 a.m. and dropped off his co-worker at his house in Marrero. He further asserted that he then went to Crawford's house, picked up Crawford and her friend, and took them to the store and another location so Crawford's friend could pick up something. Defendant also recalled going to McDonald's that morning and to pick up his suit at 12:00 p.m. He claimed that D.M. came to his house at 2:45 p.m. on that day, and that L.O. then took D.M. to get something to wear.
Defendant explained that S.M. could not have seen him on top of D.M., because in 2000 and 2001 he was residing in St. Rose, and S.M. was living with her mother. He had no documentation to show where he was living at those times. Defendant denied trying to talk to D.M. alone before Wine got to the house, and he denied asking why the deputy was there. Defendant also denied telling C.A. that he wanted D.M. to take birth control pills. He claimed that C.A. was angry because he and his wife bought their home, and that C.A. was upset because he was not paying her child support. He also claimed that C.A. was jealous because she thought he was showing favoritism to his stepchildren. Defendant stated that he could not have raped D.M. every other day or night, because he had worked offshore for the previous ten years, 21 days on the water and 7 days at home.
MOTION FOR NEW TRIAL
Although the trial judge denied defendant's untimely filed pro se "motion for post-verdict judgment of acquittal alternatively motion for new trial," he did not rule on defense counsel's timely filed motion for new trial.
*207 LSA-C.Cr.P. art. 853 provides that motions for a new trial must be filed and disposed of before sentencing. Thus, we find that the trial court erred in failing to rule on defense counsel's timely filed motion for new trial.
In State v. Lewis, 04-1074 (La.App. 5 Cir. 10/6/05), 916 So.2d 294, 301-302, writ denied, 2005-2382 (La.3/31/06), 925 So.2d 1257, this Court found in an error patent review that the trial court erred in failing to rule on defendant's timely filed motion for post-verdict judgment of acquittal and motion for new trial. In conformity with State v. Randolph, 409 So.2d 554 (La. 1981), the Court affirmed defendant's convictions and finding as a second felony offender, vacated defendant's sentences, and remanded the case to the trial court for a ruling on the motions, reserving to defendant his right to re-institute his appeal from his convictions and sentences in the event that the rulings were adverse to him.[8]
In Lewis, this Court discussed other cases involving the same issue:
In State v. Wilson, 96-251 (La.App. 5th Cir.10/1/96), 683 So.2d 775, the defendant complained that the trial court had failed to rule on defense motions for post-verdict judgment of acquittal and for new trial prior to sentencing. This Court addressed the merits of the defendant's other claims, but vacated his sentences and remanded the case to the trial court for a hearing on the outstanding motions and for a subsequent resentencing. Wilson, 96-251 at pp. 6-7, 683 So.2d at 777. More recently, this Court has remedied such errors by conditionally affirming the defendant's conviction, vacating the sentence, and remanding for rulings on the Defendant's motions;[9] or by simply vacating the defendant's sentence and remanding for rulings on the defendant's motion.[10]
State v. Lewis, 916 So.2d at 302.
In light of the foregoing, we will address defendant's assignments of error. However, defendant's sentence must be vacated and the case must be remanded to the trial court for a ruling on defense counsel's motion for new trial.
DISCUSSION
Defendant first argues that the evidence was legally insufficient to support both verdicts because the only evidence was the unbelievable testimony of the victim. He points out that the statements the victim gave to the police officers and the doctors were inconsistent and untruthful. He notes that there was no physical evidence that a rape occurred. He contends that the victim was a troubled, out-of-control teenager who made up the allegations of rape during an argument with her mother to avoid being sent to live in a juvenile home.
The state responds that the statutory elements of the offenses were proven beyond a reasonable doubt, and the trial judge's credibility determinations are not subject to re-weighing on appeal.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable *208 doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Harris, 03-1297 (La.App. 5 Cir. 3/30/04), 871 So.2d 599, 609-610, writs denied, 04-1287 (La.10/29/04), 885 So.2d 583 and 04-1289 (La.10/29/04), 885 So.2d 584. In cases involving circumstantial evidence, LSA-R.S. 15:438 mandates that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by defendant offers an exculpatory explanation of the events, but rather the reviewing court must "determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt." State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83. (emphasis as found in the original).
Defendant was convicted of aggravated incest in violation of LSA-R.S. 14:78.1 and forcible rape in violation of LSA-R.S. 14:42.1. LSA-R.S. 14:78.1 provides in pertinent part:
A. Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.
B. The following are prohibited acts under this Section:
(1) Sexual intercourse, sexual battery, second degree sexual battery, carnal knowledge of a juvenile, indecent behavior with juveniles, pornography involving juveniles, molestation of a juvenile, crime against nature, cruelty to juveniles, parent enticing a child into prostitution, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.
(2) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.
LSA-R.S. 14:42.1 provides in pertinent part:
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
(2) When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.
LSA-R.S.14:41 defines rape as follows:
A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary, and any sexual penetration, when the rape *209 involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.
Thus, the elements of forcible rape are (1) anal or vaginal sexual intercourse regardless of degree of penetration; (2) lack of consent of the victim; (3) a victim who was prevented from resisting by force or threat of physical violence; and (4) a victim who reasonably believed that resistance would not prevent the rape. State v. Alberto, 95-540 (La.App. 5 Cir. 11/28/95), 665 So.2d 614, 621-622, writs denied, 95-1677 (La.3/22/96), 669 So.2d 1222 and 96-0041 (La.3/29/96), 670 So.2d 1237.
On appeal, defendant does not contend that the state failed to prove the elements of the crimes. Rather, defendant challenges the credibility of the victim. Therefore, only that issue will be addressed herein.
The victim testified that defendant had simulated sex with her that eventually escalated to sexual intercourse over the period of several years. Dr. Benton and Det. Cummings both indicated that escalation of sexual activity was common in these types of cases. One occasion of simulated sex was corroborated by the victim's sister. Defendant denied the allegations, claiming that the victim was a rebellious, disrespectful girl who made up the allegations of rape during an argument with her mother to avoid being sent to live in a juvenile home. Defense witnesses attempted to provide an alibi for defendant on the morning of the wedding, the last time defendant allegedly raped the victim.
The testimony of the state's witnesses and that of the defense witnesses were in direct conflict. The trial judge, when faced with the conflict, apparently chose to believe the victim and the physician's explanation for the lack of physical evidence. This is a credibility determination. "It is not the function of an appellate court to assess credibility or reweigh the evidence." State v. Rosiere, 488 So.2d 965, 968 (La.1986). It is the role of the factfinder to weigh the credibility of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State v. Wallace, 00-1745 (La. App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297. In the absence of internal contradiction or irreconcilable conflicts with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a conviction. State v. Stec, 99-633 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787.
In his brief, defendant notes inconsistencies and omissions among the statements the victim made to the police officers and the doctors. Defendant claims that the victim told Cummings that there was simulated sex, but that she did not tell that to Wine or to the doctors. He indicates that the victim told Cummings that there was blood one time, but that she told the doctors she never saw any blood. Defendant contends that the victim told Cummings that the sex happened every night or every other night, but that she informed the doctors it happened once or more than once. He points out that the victim indicated to the doctors he used a condom, but that she did not mention that to Cummings or Wine. He states that the victim told the doctors she never saw any weapons, but that she told Cummings he used a knife to open the bathroom door. He also points out that the victim testified at trial he kissed her chest, but that she did not tell this to anyone else.
A review of the record reveals that the victim mentioned some things to some people and omitted others. However, the only *210 actual inconsistency set forth in defendant's brief was that the victim told Cummings she was bleeding from the vagina after the initial incident of sexual intercourse on Burnlee Street, but she told Dr. Porales she never saw any blood. This minor inconsistency does not diminish the victim's testimony. Additionally, the trier of fact could have reasonably assumed she simply did not remember that detail when she talked to Dr. Porales as it only occurred one time a couple of years prior.
Also, the victim provided reasonable explanations for some of the alleged inconsistencies and omissions. The victim explained that she told Dr. Porales she never saw any weapons because she did not consider the kitchen knife defendant used to defeat the locking mechanism on the bathroom door a weapon as he did not try to hurt her with it. She stated that if she did not tell Cummings her father sometimes used a condom, Cummings must not have asked. A review of the record reveals that Cummings testified that the victim never indicated one way or the other whether her father used a condom.
The victim also explained that she could not tell Dr. Porales the number of times they had sex because it occurred more than once. A review of the transcript of Dr. Porales' interview of the victim indicates that Dr. Porales asked the victim whether the sex occurred one time or more than one time, and that the victim gave what she considered the correct response of "more." Further, Dr. Benton testified that it was not uncommon for a child to report some things to one person and other things to another, depending on how comfortable the child was with the person, and that it was the reason they did serial history takings.
Defendant indicates in his brief that, because defense witnesses provided an alibi for him at 10:00 a.m. the day of the wedding, he could not have raped the victim that morning. The record indicates that, although Wine testified that the victim told her that that rape occurred at approximately 10:00 a.m., the victim did not testify at trial as to an exact time. Rather, the victim explained that the rape occurred sometime that morning either before or after they went to her cousin's house. Therefore, even if defendant was not home at 10:00 a.m., the trier of fact was not precluded from determining that he raped the victim on the morning of the wedding.
Defendant points out in his brief that there was no physical evidence that a rape occurred. However, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the state does not introduce medical, scientific or physical evidence to prove the commission of the offense. State v. Bolden, 03-0266 (La.App. 5 Cir. 7/29/03), 852 So.2d 1050, 1057.
In light of the foregoing, we find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support the convictions.
This assignment is without merit.
Defendant next argues that the trial court erred in finding him to be a third felony offender. He contends that proof of the prior convictions was defective because he was not advised of the minimum sentences during the prior pleas, nor was he advised that the pleas could be used to enhance a subsequent sentence.
The state responds that defendant offered no affirmative evidence at the multiple bill hearing to establish an infringement of his rights or a procedural irregularity and, therefore, he failed to meet his burden under State v. Shelton, 621 So.2d 769 (La.1993). The state also points out that defendant's argument on *211 appeal was already rejected by this Court in State v. Kelly, 01-321 (La.App. 5 Cir. 10/17/01), 800 So.2d 978, 986, writ denied, XXXX-XXXX (La.11/1/02), 828 So.2d 565.
On July 11, 2005, the state filed a multiple bill alleging defendant to be a third felony offender, and defendant denied those allegations. On October 24, 2005, defendant filed a motion to quash the multiple bill arguing that he was not properly Boykinized[11] in any prior conviction, and that the prior offenses did not form a proper predicate to enhance his sentence.
Also on October 24, 2005, a multiple bill hearing was held. The state introduced into evidence the transcript of defendant's testimony in the instant case where he admitted that the two prior convictions were his. The state next introduced into evidence State's Exhibit 2 which was comprised of certified copies of the bill of information, a waiver of rights form, the minute entry, and the commitment pertaining to the 1991 conviction for distribution of cocaine. The state also introduced into evidence State's Exhibit 3 which was comprised of certified copies of the bill of information, a waiver of rights form, and the sentencing form pertaining to the 1994 conviction for unauthorized use of an access card.
Afterwards, Beverly Ann Rittner, a qualified expert in fingerprint identification, identified State's Exhibit 4 as the fingerprints she took of defendant that morning. Rittner testified that defendant's fingerprints matched those contained in State's Exhibit 5, defendant's prior conviction for unauthorized use of an access card. Rittner further testified that defendant's fingerprints matched those contained in State's Exhibit 6, a copy of a fingerprint card in connection with defendant's conviction for distribution of cocaine.
The state subsequently argued that it had proven defendant was a third felony offender. Defense counsel responded that in neither of the two prior pleas was defendant advised of the minimum or maximum possible sentences, nor was he advised that his pleas could be used to enhance any subsequent penalty. The state countered that it had met its burden of proof, but that defendant had not, since he failed to produce evidence to support his allegation that the plea colloquies were improper. Defense counsel contended that that was the state's burden.
After hearing arguments of counsel, the trial judge found defendant to be a third felony offender. Defendant noted his objection.
When a prior conviction resulted from a guilty plea, and defendant denies the allegations in the multiple offender bill of information, State v. Shelton, 621 So.2d 769, 779-780 (La.1993), outlines the state's burden of proof. State v. Brooks, 01-864 (La.App. 5 Cir. 1/29/02), 807 So.2d 1090, 1102.
According to Shelton, the state's initial burden is to (1) prove the existence of the prior guilty pleas and (2) that defendant was represented by counsel when they were taken. If the state meets this burden, the defendant has the burden of producing some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. If the defendant is able to do this, then the burden of proving the constitutionality of the plea shifts to the state. This burden of proof will be met if the state introduces a "perfect" transcript of the taking of the guilty plea, one which *212 reflects a colloquy between judge and defendant in which the defendant was informed of and specifically waived his right to trial by jury, his privilege against self incrimination, and his right to confront his accusers. Id.
If the state introduces anything less than a "perfect" transcript, for example, a guilty plea form, a minute entry, an "imperfect" transcript, or any combination thereof, the judge must weigh the evidence submitted by each party to determine whether the state has met its burden of proving that the prior guilty plea was "informed and voluntary, and made with an articulated waiver of the three Boykin rights."[12]State v. Shelton, 621 So.2d at 780.
In the instant case, the documents submitted by the state establish both the existence of the guilty pleas and that defendant was represented by an attorney when he entered them. The state introduced certified copies of both predicate guilty pleas including waivers of rights forms that contained the three Boykin rights. The forms were signed by defendant, his attorney, and the trial judge. Additionally, the certified copies of the minute entry in the 1991 case and the sentencing form in the 1994 case reflect that defendant was advised of his Boykin rights.
Once the state met its initial burden, the burden shifted to defendant to establish an infringement of his rights or a procedural irregularity in the taking of the plea. Defendant did not testify or present any evidence at the hearing. Because defendant failed to present affirmative evidence of any infringement on his rights or procedural irregularities in the taking of his predicate pleas, the burden never shifted to the state to prove the constitutionality of the predicate pleas. See State v. Stokes, 99-1287 (La.App. 5 Cir. 4/13/00), 759 So.2d 980, 986, writ denied, 00-1219 (La.2/16/01), 802 So.2d 607.
On appeal, defendant argues that his predicate guilty pleas were defective because they did not show that he was advised of his sentencing exposure or future enhancement possibilities. However, these elements are not part of the constitutionally required Boykin rights. State v. Tomlinson, 05-201 (La.App. 5 Cir. 10/6/05), 916 So.2d 1200, 1203 citing State v. Guzman, 99-1528, 99-1753 (La.5/16/00), 769 So.2d 1158, 1164, in which the Supreme Court stated that "[t]his Court has never extended the core Boykin constitutional requirements to include advice with respect to sentencing", and State v. Anderson, 98-2977 (La.3/19/99), 732 So.2d 517. Additionally, the Louisiana Supreme Court has stated that Louisiana jurisprudence has never required that a defendant be informed that a guilty plea may be used as the basis for the filing of a future habitual offender bill of information. State v. Tomlinson, supra, 916 So.2d at 1204 (citations omitted). Also, LSA-C.Cr.P. art. 556.1 did not become effective until 1997 and, therefore, was not applicable when defendant entered his 1991 and 1994 guilty pleas. See State v. Kelly, 01-321 (La.App. 5 Cir. 10/17/01), 800 So.2d 978, 984-986, writ denied, XXXX-XXXX (La.11/1/02), 828 So.2d 565.
In light of the foregoing, we find that the trial court did not err in finding defendant to be a third felony offender.
This assignment lacks merit.
ERROR PATENT DISCUSSION
Defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State *213 v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) regardless of whether defendant makes such a request. The review reveals errors patent in this case.
The record reflects that the trial judge did not advise defendant of his multiple offender rights, as required by LSA-R.S. 15:529.1, which provides that the trial court shall inform defendant of the allegations contained in the information and of his right to be tried as to the truth thereof according to law, and shall require the offender to say whether the allegations are true. LSA-R.S. 15:529.1 implicitly requires that the trial court advise defendant of his right to remain silent. However, the failure of the trial court to advise defendant of his right to a trial and to remain silent was harmless error because his multiple offender status was established by competent evidence offered by the state at the hearing, rather than by the admission of defendant. State v. Evans, 02-1108 (La.App. 5 Cir. 3/11/03), 844 So.2d 111, 115.
There are several errors patent regarding sentencing. LSA-C.Cr.P. art. 930.8(A) provides that the prescriptive period for filing an application for post-conviction relief is "two years after the judgment of conviction and sentence has become final[.]" Subpart C of the article requires that the trial judge inform defendant of the prescriptive period at the time of sentencing. Although the commitment dated November 16, 2005 indicates that defendant was fully advised of the prescriptive period in LSA-C.Cr.P. art. 930.8, the transcript is silent. (R., pp. 257, 735-736). Where there is a discrepancy between the transcript and the minute entry, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La. 1983). Thus, on remand, we order the trial judge to advise defendant of the two-year prescriptive period in conformity with LSA-C.Cr.P. art. 930.8, by sending written notice to defendant within ten days after the rendition of this opinion and to file written proof in the record that defendant received such notice. State v. Esteen, 01-879 (La.App. 5 Cir. 5/15/02), 821 So.2d 60, 78, writ denied, XXXX-XXXX (La.12/13/02), 831 So.2d 983.
As was noted in the state's brief, the record does not reflect that defendant was notified of the sex offender registration requirements. Defendant's conviction is defined as a sex offense by LSA-R.S. 15:541(14.1). LSA-R.S. 15:540, et seq. requires registration of sex offenders. Further, LSA-R.S. 15:543(A) requires the court to notify a defendant of the registration requirements as follows: "The court shall provide written notification to any defendant charged with a sex offense of the registration requirements of R.S. 15:542. Such notice shall be included on any guilty plea forms and judgment and sentence forms provided to the defendant."
This Court has held that the trial court's failure to provide this notification constitutes an error patent and warrants a remand for written notification. See, State v. Lande, 06-24 (La.App. 5 Cir. 6/28/06), 934 So.2d 280, 300-301[13] citing State v. Stevenson, 00-1296 (La.App. 5 Cir. 1/30/01), 778 So.2d 1165, 1166-1167. Thus, we hereby order the trial court to inform defendant of the registration requirements of LSA-R.S. 15:543(A) by sending written notice to defendant within ten days of this Court's opinion and to file written proof in the record that defendant received the notice. Id.
*214 Of note, there is a more stringent notification process for child predators, of which defendant fits the definition under LSA-R.S. 15:541(3), under LSA-R.S. 15:542.1. In State v. Thompkins, 04-1062 (La.App. 5 Cir. 2/15/05), 896 So.2d 1165, 1170-1172, this Court recognized that until recently, most of its prior decisions had remanded for the trial court to provide notice of the general sex offender registration requirements contained in LSA-R.S. 15:542, as required by LSA-R.S. 15:543(A), without making a distinction of those defendants who qualified as child predators and who required notification of the registration process under LSA-R.S. 15:542.1.[14]
The Thompkins court observed that the decisions of State v. Carter, 04-482 (La. App. 5 Cir. 10/26/04), 888 So.2d 928 and State v. Myles, 04-434 (La.App.10/12/04), 887 So.2d 118 had required the trial court to notify the defendants of the registration requirements of the sexual predator registration statute, LSA-R.S. 15:542.1. The Thompkins court concluded that for defendants convicted of offenses referred to in LSA-R.S. 15:542.1, it appeared Carter and Myles had expanded the trial court's duty to provide notification of the registration requirements of LSA-R.S. 15:542.1. As such, the Thompkins court remanded the matter for the trial judge to provide written notice of the general sex offender registration provisions of LSA-R.S. 15:543 and the provisions of LSA-R.S. 15:542.1.[15]
Based on the foregoing, on remand, the trial judge is ordered to provide written notice of both the general sex offender and the child predator registration provisions.
Another error patent noted by the state in its brief was the trial judge's failure to comply with LSA-R.S. 14:78.1 E which provides as follows:
E. (1) In addition to any sentence imposed under Subsection D, the court shall, after determining the financial resources and future ability of the offender to pay, require the offender, if able, to pay the victim's reasonable costs of counseling that result from the offense.
(2) The amount, method, and time of payment shall be determined by the court either by ordering that documentation of the offender's financial resources and future ability to pay restitution and of the victim's pecuniary loss submitted by the victim be included in the presentence investigation and report, or the court may receive evidence of the offender's ability to pay and the victim's loss at the time of sentencing.
(3) The court may provide for payment to a victim up to but not in excess of the pecuniary loss caused by the offense. The offender may assert any defense that he could raise in a civil *215 action for the loss sought to be compensated by the restitution order.
The sentencing transcript does not reflect that the trial judge complied with this statute; therefore, we remand this matter for compliance with LSA-R.S. 14:78.1 E. State v. Bolden, 04-1000 (La.App. 5 Cir. 3/1/05), 901 So.2d 445, 450, writ denied, 2005-2030 (La.4/28/06), 927 So.2d 279.
CONCLUSION
Accordingly, for the reasons assigned herein, we hereby affirm defendant's convictions and finding as a third felony offender, vacate defendant's sentences, and remand the case to the trial court for a ruling on the motion for new trial.
CONVICTION AFFIRMED; SENTENCE VACATED; CASE REMANDED WITH INSTRUCTIONS.
NOTES
[1] There is some confusion in the record regarding the designation of the charges as Counts 1 and 2. In the indictment, aggravated incest is designated as Count 1 and aggravated rape is designated as Count 2. However, the return on the indictment designates aggravated rape as Count 1 and aggravated incest as Count 2. The commitment dated July 11, 2005 is consistent with the return in that it designates the forcible rape conviction as Count 1 and the aggravated incest conviction as Count 2. The commitment dated November 16, 2005 is consistent with the indictment in that it designates the aggravated incest conviction as Count 1 and the forcible rape conviction as Count 2. Nevertheless, defendant does not complain of any lack of notice of the nature of the charges.
[2] State v. Morgan, 05-K-91 (La.App. 5 Cir. 1/24/05) (unpublished writ disposition).
[3] The record does not reflect that the trial judge ruled on this motion, and this irregularity is discussed further herein.
[4] It is noted that the state was able to multiple bill defendant on both counts because he was convicted of separate felonies arising out of separate criminal offenses committed at separate times. See State v. Page, 02-689 (La.App. 5 Cir. 1/28/03), 837 So.2d 165, 177, writ denied, XXXX-XXXX (La. 11/7/03), 857 So.2d 517 citing State ex rel. Porter v. Butler, 573 So.2d 1106, 1109 (La.1991).
[5] D.M. testified at trial that she was 17-years-old and that her date of birth was January 17, 1988. The victim and her family are identified by initials in order to protect the victim's identity. See LSA-R.S. 46:1844(W)(3). State v. Polizzi, 05-478 (La.App. 5 Cir. 2/14/06), 924 So.2d 303, 316.
[6] D.M. previously testified that Crawford lived across the street from her father's house.
[7] D.M. testified that T.T. was her favorite cousin who was three years older than she was, and that she was at T.T.'s house everyday, sometimes when T.T.'s mother was not home.
[8] It is noted that this Court in Lewis addressed defendant's claim that the evidence was insufficient to support the conviction prior to remand.
[9] State ex rel. T.J., 01-384, p. 6 (La.App. 5 Cir.10/17/01), 800 So.2d 969, 973.
[10] State v. Davis, 01-1275, p. 4 (La.App. 5 Cir.4/10/02), 817 So.2d 171.
[11] Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).
[12] Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).
[13] A writ was filed with the Louisiana Supreme Court on July 28, 2006. (2006-K-1894). As of this date, there has been no action taken.
[14] Theses cases are cited in Thompkins and are not repeated here. See also, State v. Polizzi, supra, 924 So.2d at 316 (this Court reviewed jurisprudence and imposed additional notice requirement pursuant to the predator registration statute, 15:542.1(C), when victim is a minor).
[15] We note that, in several cases subsequent to Thompkins, this Court has required notification only of the general sex offender provisions and not the sexual predator provisions of LSA-R.S. 15:542.1, even though the defendants' offenses fell within the scope of LSA-R.S. 15:542.1. See, State v. Blume, 06-131 (La.App. 5 Cir. 7/25/06), 939 So.2d 472, State v. Lande, 06-24 (La.App. 5 Cir. 6/28/06), 934 So.2d 280, 300-301, State v. Singleton, 05-622 (La.App. 5 Cir. 1/31/06), 922 So.2d 647, 654, State v. Bolden, 04-1000 (La.App. 5 Cir. 3/1/05), 901 So.2d 445, 450, writ denied, 2005-2030 (La.4/28/06), 927 So.2d 279, State v. Thurston, 04-937 (La.App. 5 Cir. 3/1/05), 900 So.2d 846, 855, writs denied, 05-1332 (La.1/9/06), 918 So.2d 1040, and 05-1342 (La.1/9/06), 918 So.2d 1041. However, in the present case, we follow the holding in Thompkins and that cases cited therein.