MARION F. EDWARDS, Chief Judge.
 

 | gDefendant/appellant, Torrey D. Brown (“Brown”), was charged by bill of information with two counts of attempted first degree robbery (Counts I and II), in violation of La. R.S. 14:27:64.1; one count of first degree robbery (Count III), in violation of La. R.S. 14:64.1; and carjacking (Count IV), in violation of La. R.S. 14:64.2. After pleading not guilty to all charges, a trial was held. On May 7, 2009, a twelve-person jury found Brown guilty as charged on Counts I, II, and IV and guilty of a lesser charge of simple robbery on Count III. Prior to sentencing, the State filed a multiple bill of information, alleging Brown was a third felony offender.
 

 Brown was sentenced to serve ten years on Counts I and IV concurrently; five years on Counts II and III, to run consec
 
 *1071
 
 utive to each other and to Counts I and IV, all to be served with the Department of Corrections. Additionally, the trial court imposed the sentences on Counts I, II, and IV to be served without the benefit of parole, probation, or suspension of sentence.
 

 Following his original sentencing, Brown waived a formal reading of the multiple bill of information, which had been previously filed, and denied the allegations contained therein. Brown was subsequently adjudicated to be a third felony offender on Count IV. The trial court then vacated the previous sentence on Count IV and resentenced to him to twenty years with the Department of | ^Corrections on Count IV, without the benefit of probation, parole, or suspension of sentence, to run concurrently to Count I, and consecutively to Counts II and III. Ultimately, Brown received thirty years with the Department of Corrections given credit for time served. This timely appeal follows.
 

 Relative to Count I, the testimony and evidence is as follows:
 

 Deputy Jean Lincoln, employed with the Jefferson Parish Sheriffs Office, testified that on February 14, 2008 during roll call, at 6:00 a.m., and while patrolling, there were descriptions broadcast over the radio involving robberies at a McDonald’s located at 3407 Lapalco, a McDonald’s on Lafitte Larose, and an Exxon Station near Ames and Barataría. Specifically, Deputy Lincoln received information that there was an armed robbery, which involved a carjacking, and an armed and dangerous suspect possibly named “Torrey.” Additionally, a specific vehicle and license plate number was dispatched. Deputy Lincoln testified that, as a result of the information she received at roll call, she was looking for a tan Envoy, with a particular license plate number. Additionally, Deputy Lincoln was looking for a black male, wearing all black as a possible perpetrator.
 

 Deputy Lincoln came upon a vehicle that matched the vehicle description and license plate number given earlier. It was parked on the side of the road, in front of 2051 Savage Street, a residence. Deputy Lincoln then saw a person, who matched the description of the possible perpetrator, exiting the vehicle. Subsequently identified as Brown, the man was wearing a black top and bottom.
 

 As Brown banged at the front door of the residence, Deputy Lincoln exited her vehicle, drawing her weapon. Deputy Lincoln instructed Brown to stop and show his hands because he had something in his hand. Brown did not comply. The homeowner, later determined to be a relative of Brown, then opened the door and Brown forced his way into the home. Before entering, Deputy Lincoln observed |4Brown drop several papers. As Deputy Lincoln approached the door seconds after Brown had entered, Brown was thrown out of the residence by the owner. Ultimately, Brown was subdued by another officer. Inside the residence, some children pointed toward a sofa, underneath which Brown had thrown something. A dark wallet belonging to Ms. Kennedy was recovered by Deputy Lincoln, and the papers outside were bank slips belonging to one of the victims, Margaret Kennedy. Deputy Lincoln examined the interior of the vehicle Brown had been driving, and found a telephone receiver that had been taken from one of the stores.
 

 Erica Jackson testified that, on February 14, 2008, at around 6:00 a.m., she was working as a shift manager at the McDonald’s on the corner of Alex Kornman and Lapalco in Jefferson Parish. She first noticed Brown, whom she recognized, leaning on the front counter as if he were going to place an order. Ms. Jackson was working in the grill area, when she saw two of her cashiers run behind the counter,
 
 *1072
 
 toward the back, frightened in appearance. When she asked them what was wrong, they continued to run around a station, came back to the front, and ran out of the store. At the same time, Ms. Jackson saw someone coming around the counter; she looked up and saw that the person was Brown. She asked him, “Torrey what are you doing back here?” Brown yelled to her “don’t say my name.” She then responded back, “I know you all my life. That’s the name I know you.”
 

 Next, Ms. Jackson walked up to the front register, threw her keys on the counter, and tried to use a customer’s cell phone to call 9-1-1 to report that someone, who did not work at McDonald’s, was behind the counter and that “something bad was happening.” When she reached for the customer’s cell phone, Brown grabbed it out of her hand, but the customer grabbed it back. Ms. Jackson then proceeded to walk out of the left side of the door. She was afraid because Brown “didn’t look like himself,” he walked behind the counter, and he was | (¡wearing all black. She further testified that he looked like he was very sick, “like he wasn’t feeling well.” The other two employees had already run from behind the counter into the kitchen area. Ms. Jackson had no doubt in her mind that the person she saw that day was Brown, and she identified him in open court.
 

 A couple of hours later, the police brought Ms. Jackson to see if she could identify the person involved in the earlier incident. Ms. Jackson testified that she recognized Brown and that he was wearing black jeans and a black hoodie, the same clothes he was wearing in the store. Additionally, she testified that Brown didn’t get any money out of the register, but he did, temporarily, take the cell phone from her.
 

 Mr. Randy Johnson, a truck driver, testified that, on the day of the incident, he was just getting off of work, and he went to McDonald’s for breakfast at around 6:00 a.m. When he first walked into the McDonald’s, he did not see anybody. Then he looked over and saw a male, wearing what looked like a McDonald’s uniform, black pants, a black and red shirt, with a black jacket. The male, later identified as Brown, was standing “where they do their french fries and hashbrowns.” Mr. Johnson looked down at the menu, then he and Brown looked at one another. As Brown proceeded to walk to the back, Mr. Johnson asked, “Hey, man, somebody is going to take my order?” Brown continued to walk to the back, and then returned walking fast behind the manager, who Mr. Johnson knows as “Erica.”
 

 Mr. Johnson testified that he believed that Erica and Brown were involved in a domestic dispute because they were “calling out each other names, and he was cursing at her.” Brown was telling her, “Come back here.” When they came to the front, Erica ran from the service side of the counter to the customer side, going toward Mr. Johnson, and Brown followed. Erica grabbed Mr. Johnson, swung him |fiaround to get behind him, and asked him, “Randy, let me see your telephone. I want to call 9-1-1.”
 

 Mr. Johnson then gave her his phone and she began to dial 9-1-1, with Brown standing in front of them. Mr. Johnson admitted that he did not remember Brown having a hood on at all. When Erica began to call 9-1-1, Brown walked on the side of Mr. Johnson and grabbed the phone out of her hand. Mr. Johnson then grabbed it back and believed that he and Brown were about to fight. Instead, Brown stepped back and “he (Brown) showed like had like something under his jacket.” Mr. Johnson further testified that he did not know what he had but “it had a little shape to it and it was pointing from up under his jacket.” Mr. Johnson
 
 *1073
 
 believed that he thought it could have been a gun or a knife. Brown then told Mr. Johnson, “Don’t get hurt behind these people’s s* *t.” Mr. Johnson further testified that Brown was “out of it,” looked “like he was on drugs,” and was talking to himself.
 

 At that point, Brown backed away, went around to the register, and told Erica, “If you don’t open this f* * *ing register I’m going to blow your brains out,” or “beat your brains out.” Mr. Johnson then knew that “it was a robbery or something shady going on.” Erica was standing behind Mr. Johnson, trying to get out of the store when Brown went around the register and tried to open it himself. As he did so, some other ladies ran from the back. Mr. Johnson then saw Brown beating on the counter, and heard him murmur to himself, “Well, f* * * it. I’m going to the safe.” Mr. Johnson stated that when Brown went to the safe “we (Mr. Johnson, Erica, and another older man who was in the store) all just ran out the store.” Brown did not try to take anything from Mr. Johnson.
 

 Mr. Johnson went to the parking lot. When the police came, Mr. Johnson and the other people at the scene indicated that Brown was still in the store. After 17the police stated they did not see anyone inside, Mr. Johnson then saw a woman walking around saying that that somebody took her car. Mr. Johnson later identified Brown as the perpetrator from a photographic lineup and also made an in-court identification.
 

 Ms. Whitney Whyte testified that she was working in the kitchen at the McDonald’s on Lapalco Boulevard on February 14, 2008. Ms. Whyte’s father drove her to work and she arrived at around 6:00 a.m. She then put her purse down on the counter and went back through the door to get her father some coffee. As she went through the door, she observed two persons at the front counter: an old man and someone, later identified as Brown, wearing black over his head. According to Ms. Whyte, Brown was wearing a jacket that was entirely zipped and remained zipped throughout the entire incident. She brought her father the coffee, came back inside, picked up her purse, and went to the “crew room.”
 

 On her way back from the crew room, she heard an old lady, later identified as the cashier, “Ms. Rosetta,” in the front screaming for the manager, saying that “this man is trying to rob us.” Ms. Rosetta was running and Brown was coming behind her. At that time, Ms. Whyte encountered Erica, the manager, near the ice machine. Ms. Rosetta joined Ms. Whyte. Ms. Whyte observed Brown wearing a black sweatshirt with a hood over his head, with black pants.
 

 Meanwhile, Erica recognized Brown and called him by name saying, “Torrey, get from behind the counter.” With his hand in his right pocket “like it was a gun,” Brown responded, “Just open the register, y’all going to lose y’all life over a few change, just open the register.” Ms. Whyte admitted that she believed it was a gun and was afraid.
 

 While inside the store, Erica asked Ms. Whyte to use her cell phone and dial 9-1-1; however, before Erica could speak to the operator, Ms. Whyte took the Rphone back to call her father. At that time, Ms. Whyte, Erica, and Ms. Rosetta were running and Brown was walking around. Ms. Whyte then testified that she, Erica, and Ms. Rosetta went outside where she observed the other customer who was at the counter. Additionally, Ms. Whyte declared that there was a “prep lady,” named “Bianca,” who never left the store during the entire incident. When the police arrived, Brown was not there because “he took the lady car in the drive-thru.” Later, Ms. Whyte picked Brown out of a
 
 *1074
 
 photographic lineup and also identified him in court.
 

 The evidence regarding Count III is as follows:
 

 Ms. Evelyn Dennis testified that she was the store manager at Exxon on Bara-taría on February 14, 2008. At around 7:00 a.m., Ms. Dennis was working in the store, with six or seven customers also inside. Ms. Dennis noticed a person, later identified as Brown, fumbling inside of his pockets with his hands, walking back and forth from the cooler to the front of the store, letting customers go ahead of him for a period of ten or fifteen minutes. Ms. Dennis testified that she observed Brown moving his hand “trying to pretend like he had a weapon in his pocket.” She kept watching him, and dialed 9-1-1 on the speaker phone. Particularly, Ms. Dennis testified that “[Brown] was trying to fix his finger, as if it’s a weapon. But [she] kept watching him, and he — he kept changing hands. That’s what made [her] notice it wasn’t a weapon.” Ms. Dennis further explained that she did not believe Brown had a gun in his pocket because she noticed him fumbling, “using both hands trying to figure out how he can pretend like it was a weapon.”
 

 Brown then came up to the register with a pack of gum and one hand inside of his pocket. Ms. Dennis scanned the gum and when she told Brown the price of the gum he told her to “give him everything [she] had in the register.” Ms. Dennis 1 ^responded, “What are you going to shoot me with, your finger?” At the time the 9-1-1 operator answered, Brown heard it, and he went behind the counter. He struggled with the instrument which was mounted on the wall, “snatched the phone,” and left with the receiver end of the phone. Ms. Dennis testified that she did not have her hands on the phone at the time Brown took it.
 

 Ms. Dennis identified Brown on the scene at Savage Avenue within thirty minutes of the incident. She also identified him in court. The phone receiver taken from the Exxon Station was later recovered by Deputy Lincoln inside of Ms. Kennedy’s vehicle and later returned to the store.
 

 Darlene Morton testified that she was at an Exxon Station between 6:00 a.m. and 7:00 a.m. on the day of the incident. Ms. Morton observed a person, later identified as Brown, taking a telephone out of the store and leaving with it. While she was getting coffee, Ms. Morton heard the store manager say, “Take your hand out of your pocket,” and Ms. Morton turned and looked at Brown. She noticed that he was wearing a black hooded jacket, with the hood over his head, and his hand pointed up in the jacket. Brown told the store manager to “give me everything in the register,” at which point she heard the store manager say “take your hand out of your pocket and get out of here.” She also recalled the manager say, “What are you going to shoot me with, your finger?” Ms. Morton followed Brown outside and recorded the license plate number of the vehicle and gave it to the store manager of the Exxon Station.
 

 In his defense, Brown testified that, on the morning of the incident, he was standing outside of his sister’s house on Caddy Drive, in Marrero, Louisiana, where he was living. He was dropped off at that location at around 7:10 or 7:15 a.m., and from there he proceeded to walk to his cousin’s house on Savage Avenue because his sister did not answer nor did he have a key. Brown asserted that he | inwas wearing “a black thermal, a red thermal, and black jeans on the day of the incident.”
 

 On the way to his cousin’s house, Brown observed several police cars, one which was occupied by Deputy Jean Lincoln. He
 
 *1075
 
 saw more police units, and because he had been stopped by police in the past, he hurriedly approached his cousin’s door, and began to bang on it. Several deputies, including Deputy Lincoln, drew their guns and Brown stopped banging on the door and put his hands up. At no point did he resist. Brown was tackled and punched, then handcuffed and put into the police unit.
 

 Brown testified that, after he was arrested in front of his cousin’s house, the police officers removed him from the police unit and put a black hooded jacket on him provided by Detective Barteet. Brown also testified that the stolen SUV was not there when he walked up to his cousin’s house and knocked on the door. Rather, he observed the vehicle being driven onto the scene by Detective Barteet. Brown denied being at either of the McDonald’s stores or the Exxon Station on the day of the incident, and, further, denied ever robbing anyone from the stores. Additionally, he urged that he never saw or came into contact with Ms. Kennedy’s vehicle or personal effects, or the telephone receiver taken from the Exxon Station. He insisted that he was not the person in the pictures or videotapes recorded from the incident, which videotapes were played for the jury. Brown explained that a conspiracy to implicate him was fabricated by Erica, who lives next door to his mother, and the police, both of whom have a vendetta against him.
 

 On cross examination, Brown admitted to lying under oath and pleading guilty to avoid jail time on a previous charge. When questioned as to how the black hooded jacket in State’s Exhibit 5 had grass on it if it was put on him after he was Intackled to the ground, he responded that another struggle ensued and he was thrown on the ground again.
 

 Brown contends that the evidence was insufficient to convict him on Counts I and III. With regard to Count I, Brown urges that the bill of information was amended to list McDonald’s Restaurant rather than a human victim and that La. R.S. 14:64.1 specifically requires that the defendant “take something of value from someone,” not “someplace.” Here, the bill of information had previously named the victim as the cashier, Rosietta Miller, but was amended in open court to substitute “McDonald’s” as the victim. There was no objection to this amendment. Further, our error patent review discloses that, in addition to amending Count I, the State amended Count II to read that Brown attempted an armed robbery of McDonald’s, rather than of the named victim, Victoria Garland. In the interest of judicial economy, we will address both issues at once.
 

 The technical sufficiency of the bill of information may not be questioned after conviction where the accused has been fairly informed of the charge against him by the bill, has not been prejudiced by surprise or lack of notice, has not raised an objection to the bill prior to the verdict, and is protected against further prosecution by examination of the pleadings and the evidence on the present conviction.
 
 [1]
 
 Although the bill may have been technically defective by naming as victim a corporation rather a person, a review of the record reveals that Brown was fairly informed of the charge against him and has not been prejudiced by surprise or lack of notice. Moreover, he is protected against further prosecution by examination of the pleadings and the evidence on the present conviction.
 

 
 *1076
 
 As to the evidence, the constitutional standard for testing the sufficiency is whether after viewing the evidence in the light most favorable to the prosecution, | 12any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 [2]
 
 Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.
 
 [3]
 

 Brown was charged and convicted of attempted first degree robbery on Count I, in violation of La. R.S. 14:27:64.1 and La. R.S. 14:27(A). La. R.S. 14:27:64.1 defines first degree robbery as the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon. La. R.S. 14:27(A) provides that to attempt to commit a crime, an accused must do or omit an act tending directly toward the accomplishment of the crime while “having a specific intent” to commit the crime. Specific intent is a state of mind and, as such, need not be proven as a fact, but may be inferred from the circumstances and actions of the accused.
 
 [4]
 
 In order to prove an attempted first degree robbery, the State had only to prove that Brown had committed an act in furtherance of committing a robbery, and not that he actually took something of value.
 
 [5]
 

 The Louisiana Supreme Court has explained that the first degree robbery statute has both objective and subjective components.
 
 [6]
 
 The Court stated:
 

 It requires the state to prove that the offender induced a subjective belief in the victim that he was armed with a dangerous weapon, and that the victim’s belief was objectively reasonable under the circumstances. The statute thus excludes unreasonable panic reactions by the victim but otherwise allows the victim’s subjective beliefs to |1sdetermine whether the offender committed first degree robbery or the lesser offense of simple robbery....
 

 Direct testimony by the victim that he believed the defendant was armed, or circumstantial inferences arising from the victim’s immediate surrender of his personal possessions in response to the defendant’s threats, may support a conviction for first degree robbery....
 
 [7]
 

 In
 
 State v. Cook,
 

 [8]
 

 this Court acknowledged that there was no testimony from the victim or from eyewitnesses that they believed the defendant in that case had a weapon. However, the victim did immediately comply with the defendant’s demands, and the defendant’s actions were sufficient to cause one of the witnesses to press the bank’s alarm button. Given these circumstances, we inferred that the victim believed the defendant had a dangerous weapon during the course of the
 
 *1077
 
 robbery. In considering another count in that same case, the victim testified that, in the course of her encounter with the robber, he told her, “You don’t have to die over this.” She testified that the defendant jiggled his shirt, and she believed he was carrying a weapon under the shirt. We found this testimony clearly sufficient to prove that defendant induced a subjective belief in the victim that he was armed with a dangerous weapon, and such a belief was reasonable under the circumstances.
 

 The present case is analogous. Although Ms. Jackson did not testify that she thought Brown had a weapon, she stated that he was behind the counter where he should not have been, causing her to throw her keys and run away from him. Mr. Johnson testified that she ran behind him, and Brown threatened to either “blow her brains out” or “beat her brains out,” and acted as if he had something under his shirt that he believed could have been a gun or knife. Mr. Johnson also stated Brown told him, “Don’t get hurt behind these people’s s* *t.” Ms. Whyte testified | uthat she heard the cashier screaming that Brown was trying to rob the place and that, while Brown was saying, “you’re going to lose your life over a few change,” he had his right hand in his pocket, “like it was a gun.” Ms. Whyte admitted that she believed it was a gun and she was afraid. Brown unsuccessfully attempted to open the cash register. Although Brown testified that he was not present and did not commit the alleged acts, the credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier-of-fact.
 
 [9]
 
 It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier-of-fact or to reweigh the evidence absent impingement on the fundamental due process of law.
 
 [10]
 

 Under the circumstances presented here, we find that Brown induced a subjective belief that he was armed with a dangerous weapon in his attempt to rob the restaurant and that such a belief was reasonable under the circumstances.
 

 As to Count III, Brown contends that the State failed to prove beyond a reasonable doubt that defendant took something of value from the victim, Ms. Dennis, while leading her to reasonably believe that he was armed with a dangerous weapon, which was an essential element of the charge. Brown argues that Ms. Dennis never believed that he had a weapon.
 

 Brown was charged with first degree robbery on Count III, in violation of La. R.S. 14:64.1; however, he was convicted of simple robbery, a violation of La. R.S. 14:65, which was a lesser included offense. In the statute, simple robbery is defined as “the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, but not armed with a dangerous weapon.” The elements necessary to ^sustain a conviction of simple robbery are: 1) the taking of anything of value; 2) belonging to another; 3) from the person of another; 4) by use of force or intimidation.
 
 [11]
 
 Black’s Law Dictionary (9th Ed.2009) defines force, in part, as power, violence, or pressure directed against a person or thing. Although Ms. Dennis did not testify that she was intimi
 
 *1078
 
 dated, she, nevertheless, was sufficiently alarmed to call 9-1-1; further, the act of going behind the counter after hearing the operator, grabbing at the phone which was in the immediate control of Ms. Dennis, and snatching the receiver constitutes force within the meaning of the statute.
 

 The jury was presented with all of the evidence, and it apparently rejected Brown’s testimony. The evidence, viewed in a light most favorable to the State, was sufficient to establish that Brown was guilty of the essential elements of the crimes beyond a reasonable doubt on Counts I and III.
 

 This assignment of error is without merit.
 

 PRO SE ASSIGNMÉNT OF ERROR NUMBER ONE
 

 Brown challenges the application of the multiple offender statute, contending that it provides an unconstitutional advantage to the prosecution because a defendant is not afforded the same procedural and adversarial protections as the prosecution. However, this issue was not raised in the trial court. This Court has held that the constitutionality of a statute cannot be raised on the first time on appeal.
 
 [12]
 
 Further, because we find, infra, that the multiple offender proceedings were defective, we pretermit further discussion of the
 
 pro se
 
 assignments of error.
 

 Brown requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with La.C.Cr.P. art. 920 | ^regardless of whether defendant makes such a request.
 
 [13]
 
 Our review reveals one patent error requiring correction.
 

 Pursuant to La. R.S. 15:529.1, the trial court shall inform defendant of the allegations contained in the information and of his right to be tried as to the truth thereof according to law, and shall require the offender to say whether the allegations are true.
 
 [14]
 
 The record in the present case does not reflect that the trial court advised Brown, at the multiple offender hearing, of his right to a formal hearing, to have the State prove its case under the multiple offender statute, or of his right to remain silent.
 

 Generally, a trial court’s failure to advise the defendant of his right to a hearing and his right to remain silent is considered harmless error, when the defendant’s multiple offender status is established by competent evidence offered by the State at a hearing, rather than by admission of the defendant.
 
 [15]
 
 In the instant matter, defense counsel stipulated what the testimony of the fingerprint expert would be if he testified, and further stipulated that Brown was the same person convicted of the predicate offenses. A hearing was held on defense counsel’s objections to the evidence on one of the predicate offenses, following which the trial court adjudicated Brown to be a third felony offender.
 

 However, we find that, because Brown was never informed of his statutory rights under La. R.S. 15:529.1(D), his acknowledgment or confession of his prior felony convictions is invalid.
 
 [16]
 
 The stipulation as to the testimony of the fingerprint expert
 
 *1079
 
 does not change our analysis inasmuch as it, too, was made in the absence of the required advice. Further, although the State presented certified 117copies of Brown’s predicate convictions, it did not present sufficient proof that he was the same person that pled guilty to those offenses.
 

 Establishing a defendant’s identity as the same person convicted of a prior felony offense may be accomplished by a variety of methods, including the testimony of witnesses, fingerprint analysis by an expert, photographs contained in a duly authenticated record, or evidence of identical driver’s license number, sex, race, and date of birth.
 
 [17]
 
 However, merely establishing that defendant’s name and that of the person previously convicted are the same is not sufficient evidence of identity under the multiple offender statute.
 
 [18]
 

 In viewing State’s Exhibits 1-5, we find that Brown’s identity was not sufficiently established in any other acceptable manner. There was neither witness testimony nor any authenticated photographs introduced into evidence. Most significantly, Brown’s birthdate listed on State’s Exhibit 1 for his underlying conviction is different from the birthdates listed in State’s Exhibits 2-5, for the predicate convictions.
 

 In accord with the prevailing jurisprudence, we must reverse Brown’s multiple offender adjudication. We note that he is not protected by principles of double jeopardy from being tried again on the question of the prior felony convictions.
 
 [19]
 

 Based on the foregoing, we reverse Brown’s multiple offender adjudication, vacate his enhanced sentence, and we remand to the trial court for proceedings | ^consistent with this opinion. In all other respects, the underlying conviction and sentence are affirmed.
 

 AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; REMANDED
 

 [1]
 

 .
 
 State
 
 v.
 
 James,
 
 305 So.2d 514 (La.1974);
 
 State v. Butler,
 
 41,985 (La.App. 2 Cir. 6/20/07), 960 So.2d 1208,
 
 writ denied,
 
 07-1678 (La.5/9/08) 980 So.2d 685.
 

 [2]
 

 .
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 See also, State v. Ortiz,
 
 96-1609 (La. 10/21/97), 701 So.2d 922, 930,
 
 cert. denied,
 
 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
 

 [3]
 

 .
 
 State v. Harrell,
 
 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
 

 [4]
 

 .
 
 State v. Davenport,
 
 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 449,
 
 writ denied,
 
 09-158 (La.10/16/09), 19 So.3d 473.
 

 [5]
 

 .
 
 State v. Cook,
 
 98-848 (La.App. 5 Cir. 1/26/99), 729 So.2d 634, 639,
 
 writ denied,
 
 99-570 (La.6/25/99), 745 So.2d 1185.
 

 [6]
 

 .
 
 See, State v. Fortune,
 
 608 So.2d 148 (La.1992).
 

 [7]
 

 .
 
 State v. Fortune,
 
 608 So.2d at 149 (citations omitted).
 

 [8]
 

 . 98-848 (La.App. 5 Cir. 1/26/99), 729 So.2d 634,
 
 writ denied,
 
 99-0570 (La.6/25/99) 745 So.2d 1185.
 

 [9]
 

 .
 
 State v. Jones,
 
 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234,
 
 writ denied,
 
 09-2394 (La.10/15/10), 46 So.3d 1282.
 

 [10]
 

 .
 
 Id.
 

 [11]
 

 .
 
 State v. Robinson,
 
 97-269 (La.App. 5 Cir. 5/27/98), 713 So.2d 828, 830,
 
 writ denied,
 
 98-1770 (La.11/6/98), 727 So.2d 444.
 

 [12]
 

 .
 
 State v. Lewis,
 
 08-437 (La.App. 5 Cir. 11/12/08), 1 So.3d 535, 538,
 
 writ denied,
 
 09-147 (La.10/2/09), 18 So.3d 102.
 

 [13]
 

 .
 
 See, State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990).
 

 [14]
 

 .
 
 State v. Morgan,
 
 06-529 (La.App. 5 Cir. 12/12/06), 948 So.2d 199;
 
 State v. Babineaux,
 
 08-705 (La.App. 5 Cir. 1/13/09), 8 So.3d 621;
 
 State v. Bourgeois,
 
 08-211, pp. 3-4 (La.App. 5 Cir. 10/28/08), 998 So.2d 165.
 

 [15]
 

 .
 
 State v. Bourgeois, supra.
 

 [16]
 

 .
 
 Id.
 

 [17]
 

 .
 
 State v. Murphy,
 
 09-805 (La.App. 5 Cir. 2/23/10), 34 So.3d 886, 889,
 
 writ denied,
 
 10-0690 (La.10/15/10), 45 So.3d 1110 (citations omitted).
 
 See also, State v. Westbrook,
 
 392 So.2d 1043, 1045 (La.1980).
 

 [18]
 

 .
 
 Id.
 

 [19]
 

 .
 
 See, State v. Babineaux, supra.