SUSAN M. CHEHARDY, Chief Judge.
| ¡.This is a consolidated case, comprising an appeal by the defendant from his convictions after trial on the merits, as well as a writ application by the State from the habitual offender proceeding, in which the trial court found the defendant to be-a second-felony offender rather than a third-felony offender. We affirm the convictions and affirm the sentences, deny the writ application, and remand for correction of a patent error.
STATEMENT OF THE CASE
On March 11, 2010, the Jefferson Parish Grand Jury indicted E.J.M., III,[1] on three counts of sexual offenses: count 1, violation of La. R.S. 14:42 by aggravated rape of a known juvenile, in which the victim was under the age of 12; count 2, violation of La. R.S. 14:81.2 by molestation of a known juvenile; and count 3, violation of La. R.S. 14:78.1 by aggravated incest upon a known juvenile. The defendant was arraigned the next day and pleaded not guilty. On September 28, 2011, the State amended count 2 of the indictment to show the date of the offense as on or between February 1, 2006 and March 22, 2008.
| o,The case was tried before a 12-mem-ber jury on September 28, 29, and 30, 2011. On count 1 the jury returned the responsive verdict of guilty of attempted indecent behavior with a juvenile. On counts 2 and 3 the jury found the defendant guilty as charged.
On November 7, 2011, the trial court sentenced the defendant to imprisonment at hard labor for two years on count 1, imprisonment at hard labor for 15 years on count 2, and imprisonment at hard labor for 15 years on count 3, with the sentences on counts 2 and 3 to run concurrently, and the sentence on count 1 to run consecutively to the sentences on counts 2 and 3. The trial court also ordered the first five years of the sentence on count 2 to be served without benefit of parole, probation, or suspension of sentence.
Also on November 7, 2011, the defendant made a timely oral motion for an appeal and notified the court of his intention to file a written motion. On December 9, 2011, he filed a written motion for appeal that was granted.
On March 19, 2012, the State filed a habitual offender bill alleging the defendant to be a third-felony offender. The next day, the defendant filed a response to the multiple bill. The multiple bill hearing began on May 14, and was carried over to June 21, August 20, and August 23, 2012. At conclusion of the hearing, the trial court found the defendant to be a second-felony offender. On August 23, 2012, the trial court vacated the original sentence on count 3 and resentenced the defendant under the Habitual Offender statute, La. R.S. 15:529.1, to 30 years in the Department of Corrections, without benefit of probation or suspension of sentence.[2]
|4On September 27, 2012, the State filed a writ application challenging the trial court’s ruling that the defendant was a second-felony offender rather than a third- *653 felony offender. On October 26, 2012, this Court consolidated the writ application (12-KH-732) and the appeal (12-KA-774), finding that the writ application is related to and arises out of the same case as the appeal.
FACTS
This case involves allegations of sexual misconduct against the defendant made by two victims, K.P. (count 1) and N.M. (counts 2 and 3).
Prior to any testimony at trial, the prosecution and the defense stipulated that the defendant’s date of birth is October 18, 1974, KP.’s date of birth is October 12, 1980, N.M.’s date of birth is March 23, 1991, and that the defendant is N.M.’s biological father.
At trial, Detective Joseph McRae of the Kenner Police Department was the State’s first witness. Initially he testified to the Kenner Police Department’s protocol in cases of physical or sexual abuse against children. The protocol typically involved a forensic interview at the Children’s Advocacy Center and a referral to Children’s Hospital for a medical examination. However, he stated, that protocol may be altered when the victim delays in reporting the criminal activity or if the victim is over the age of sixteen. In those instances, Detective McRae said, he would conduct the interview himself and would not necessarily refer the victim to Children’s Hospital.
On December 10, 2009, Detective McRae met with K.P. in connection with the investigation of a sexual assault on her niece. During their meeting, K.P. disclosed that she had been sexually abused when she was nine years old and provided him with information about the perpetrator. Detective McRae set up a 15sep arate interview to record a statement regarding the incident of abuse from KP.’s childhood.
On December 16, 2009, K.P. identified the defendant as the perpetrator from a photographic lineup. Detective McRae then took a recorded statement from K.P. detailing her report of sexual abuse by the defendant. Detective McRae testified that he did not refer K.P. to Children’s Hospital for a forensic medical examination because approximately 19 years had passed between the incident and KP.’s report.
On cross-examination, Detective McRae testified that KP.’s statement reflected that her sister was in the house where the sexual abuse took place at the time it occurred. Detective McRae stated that he did not interview KP.’s sister because K.P. had told him her sister was unaware of the incident.
The State’s next witness was K.P., the victim of the offense charged in count 1. She identified the defendant in court as the perpetrator of sexual abuse against her when she was nine. She testified that when she was nine years old, she lived in the defendant’s grandmother’s house located on 31st St. in Kenner. At the time of the incident in question, KP.’s sister was dating the defendant. According to K.P., the defendant came over to her house on a day when her sister was studying for exams. While her sister studied, the defendant sat down with K.P., who was watching cartoons in a different part of the house. K.P. testified that the defendant undressed her and began touching her chest and genitals. She testified that she was afraid, and “froze up.” She testified that the defendant laid her down on the couch, removed his pants, and tried to force his erect penis into her vagina. He stopped when they heard her mother coming home from work.
Shortly after this incident, KP.’s sister, T.M., discovered that she was pregnant with the defendant’s daughter, who was *654 born the following year. Her sister was roughly 15 years old at the time. K.P. testified that she did not disclose |fithe abuse for years, and had only recently told her sister. Her sister’s daughter, N.M., is the other victim in this case.
The State’s third witness was T.M. She testified that K.P. is her sister and the defendant is the father of her daughter, N.M. She testified she was 14 years old when she began dating the defendant, who was about six months older. She corroborated K.P.’s testimony that their family was living in the defendant’s grandmother’s house while she was dating the defendant, and that the defendant visited the house frequently. According to T.M., K.P. became very upset after learning that the defendant had allegedly sexually abused N.M. K.P. told her that she could have prevented N.M.’s sexual abuse. When T.M. asked K.P. how she could have prevented it, K.P. explained to T.M. that she had been raped by the defendant as a child.
T.M. testified that the defendant did not come to see N.M. until she was about three months old. When N.M. was two years old, the defendant joined the military and after that was not involved in her life until she was about 15 years old. When the defendant returned to the area, he called T.M. from his mother’s house and said that he wanted to see N.M. T.M. initially refused his request. When N.M. found out that her father wanted to see her, she was excited and expressed a desire to build a relationship with her father.
Ultimately, T.M., her husband, and N.M. met with the defendant at the home of a relative in Laplace. T.M. testified that the defendant immediately requested that N.M. spend the night at his grandmother’s house where he now lived. T.M. initially refused, but eventually allowed N.M. to spend occasional nights and weekends with her father. T.M. stated that she granted the defendant’s request “against [her] better judgment.”
17Eventually, N.M. was allowed to spend up to a week at a time with the defendant, and later visited him at his subsequent residence in Mississippi. The visits took place from when N.M. was 15 until she was a high school senior, approximately 2006-2008. T.M. testified that she was furious upon discovering that the defendant had taken N.M. to a nightclub when N.M. was 15, something that . T.M. never would have allowed.
The fourth witness for the State was Detective Lashonda Woodfork of the Ken-ner Police Department. She testified that on September 14, 2009, she was assigned to investigate the aggravated incest case involving the defendant and N.M. Detective Woodfork testified she conducted an interview with and took a statement from N.M. on October 16, 2009. During the course of the investigation, Detective Woodfork discovered that the defendant was N.M.’s biological father, that N.M. was under the age of 18 between 2006 and 2008, and that the acts in question occurred at 933 31st St. in Kenner.
Detective Woodfork testified that N.M. told her of three incidents of sexual intercourse with the defendant between 2006 and 2008, which formed the basis of the defendant’s arrest. She explained, however, that N.M. told her it happened more than three times. Detective Woodfork did not send N.M. to Children’s Hospital for a forensic medical examination because N.M. was an adult.
N.M. gave Detective Woodfork the name of her half-sister, I.M., as a possible witness to the abuse. On October 21, 2009, Detective Woodfork called I.M., told her she was investigating N.M.’s allegations that the defendant had raped N.M., and *655 discussed the incident when I.M. and N.M. stayed overnight at the house on 31st Street.
On December 11, 2009, Detective Wood-fork arranged a “one-party consent” telephone call, in which N.M. called the defendant and the detective recorded the | ¡^conversation with N.M.’s consent. At the beginning of that telephone conversation, the defendant said he had received a call from I.M., who told him that the police had called her about him. Based upon that, Detective Woodfork did not expect to obtain any further evidence as a result of that telephone conversation, but it was continued nonetheless. A tape of the phone call was played for the jury.
After Detective Woodfork’s investigation, an arrest warrant was issued for defendant.
The State’s next witness was N.M., the defendant’s daughter, who is the victim of the offenses in counts 2 and 3. At the time of her trial testimony, N.M. had been married for almost a year and was expecting a baby. She identified the defendant as her father and as the person who had raped her. She said that her earliest memory of the defendant was meeting him when she was approximately 14 years old.
N.M. recounted nine instances of being raped by her father between 2006 and 2008. She testified the first episode occurred shortly after Mardi Gras in 2006, when she was 14 years old. She was sitting with the defendant on a sofa in the den of the home of the defendant’s mother, N.M.’s grandmother, at 933 31st Street in Kenner.[3] N.M. testified that she and the defendant were watching the movie Robots, and a friend of his was asleep on a couch in the same room. N.M. stated that it was past midnight, and the defendant had earlier encouraged her to drink alcohol, which he provided. She said the defendant tried to get her to lie down by stretching out behind her with his head on the side of the couch where she was sitting. Eventually she complied. The defendant started rubbing N.M.’s legs, trying to reach under her shirt to touch her breasts, and trying to remove her pants.
IflN.M. testified that she was shocked and afraid. When she heard the defendant unbuckle his pants, she tried to push his hands away and told him “no.” N.M. testified that her back was to the defendant, and that he vaginally penetrated her from behind. During the rape, the defendant told N.M. it would be good practice for when she had a boyfriend.
The second time occurred when N.M. went to her grandmother’s house again to spend the night. N.M. was 15 years old, which she knew because it was after her March 23, 2006 birthday, and because she waited a while after the first time before she went to her grandmother’s house again. The defendant offered N.M. alcohol that night, which she refused. The defendant, however, drank alcohol that night. N.M. got out of the shower, went into a bedroom across from her grandmother’s room, and lay down on her back in bed. Defendant then came into the room, and got on top of her in bed, with the front of his body facing the front of her body. N.M. “froze up” and panicked, after which defendant penetrated her vaginally with his penis. N.M. said she resisted the defendant in the same manner she had the first time he raped her. N.M. stated that she did not know what to do.
The third time, also at the home of N.M.’s grandmother, occurred in 2006 when N.M. was 15 years old. N.M. was *656 spending the night and sharing a bedroom with her half-sister, I.M., who was also the defendant’s daughter and was two years younger than N.M. The defendant kept trying to get I.M. and N.M. to sleep in separate bedrooms, but N.M. did not want to do that because she did not want to be raped again. N.M. and I.M. were asleep in the same bed, but N.M. awakened when she heard the defendant’s knees cracking and realized he had entered the room. The defendant reached under the covers and rubbed N.M.’s legs and breasts. He 1 intried to get her to come into the den, but she refused. N.M. nudged I.M. to try and wake her up, but was unsuccessful.
N.M. said the defendant left the room, but came back in and pulled on her. N.M. ultimately agreed to step outside, but left the door ajar, hoping I.M. would hear them. N.M. said she cried, told the defendant, “No,” and went back into the room. She told I.M. their father was “stupid,” because he was trying to get her (N.M.) to come into the den. I.M. agreed the defendant was “stupid,” but fell back asleep.
The defendant came into the room again and rubbed I.M.’s legs. N.M. said the defendant’s name, and the defendant came around and rubbed on N.M.’s legs. N.M. told the defendant, “No,” and scratched, hit, and elbowed him, but he got into bed with the front of his body facing the back of N.M.’s body, as in the first incident. He then pulled N.M.’s pants down and raped her from behind, which she explained meant he put his penis into her vagina.
N.M. testified that throughout this incident, I.M. remained very still and appeared to be sleeping, although according to N.M., “there’s no way that [she was] sleeping.”
N.M. testified the defendant raped her in locations other than her grandmother’s house. One time the defendant picked N.M. up from her grandmother’s house and drove her to a location off the service road near Sam’s in Kenner. The defendant parked the car, pushed N.M.’s front passenger seat back, and removed his and her clothes. N.M. said “no” and resisted, but the defendant performed oral sex on her and then penetrated her vagina with his penis.
Another time the defendant took her for a ride in the car and brought her to the same spot, where he raped her again.
|nYet another time, the defendant drove N.M. to an area behind some houses in the Lincoln Manor neighborhood, down the street from her grandmother’s house. He performed oral sex on N.M. and penetrated her vaginally with his penis.
Twice the defendant took N.M. to Lake Pontchartrain by the Treasure Chest Casino. The first time the defendant brought N.M. on the rocks by the water. She resisted and told him “no,” but nevertheless he performed oral sex on her and then penetrated her vaginally with his penis.
The next time, the defendant was supposed to bring N.M. back to her mother’s house, but instead he brought her by the lake again. N.M. told him “no” and begged him not to rape her, saying that she was his daughter and she loved him. The defendant told N.M. he did not know how he loved her, but he did not love her like a daughter. Afterward, the defendant inserted his penis into her vagina, the same way he did the first time he took her to the lake.
Another time, the defendant and N.M. were supposed to go to a football game; instead, the defendant took N.M. to a hotel on Williams Boulevard that started with a “C” and was known for its holiday decorations. N.M. said she had a “bad attitude” toward the defendant, so he told her to relax and gave her a pill; however, she refused to take it. The defendant then *657 took a shower, after which he penetrated N.M. vaginally with his penis, with the front of his body facing the front of her body.
N.M. testified that the defendant raped her from 2006 to 2008, and that the last time occurred when he took her to the lake. She explained that she kept seeing the defendant because she thought if she talked to him he would stop raping her. She also thought that if she refused to see the defendant, her parents would want to know why, and she would have to talk about it, which she did not want to do. | i2N.M. asserted that defendant offered her alcohol often, and that he once took her to a nightclub.
N.M. testified that in 2009, when she was 18 years old, she and her boyfriend (whom she later married) were discussing their sexual histories. She told him she had never willingly had sex with anyone. He continued to question her, and ultimately she disclosed to him that her father, the defendant, had raped her.
Subsequently she reported the abuse to the police. Initially she described the three specific incidents that she could remember in detail, but later disclosed further abuse. When asked to describe what she meant by the word “rape” in her testimony, N.M. stated that the defendant had vaginally penetrated her and touched her genitals and breasts with his mouth and hands. As time passed, she was able to recall more incidents, some of which she came forward with the week before trial and others within a few months before trial.
The State’s next witness was N.M.’s husband[4], who testified that he has known N.M. since middle school, and that they married in November 2010. He testified that N.M. told him her father raped her. He said her demeanor as she talked about it was very quiet and tense. He stated that to his knowledge, he was the first person to whom N.M. had disclosed this information.
The seventh witness for the State was I.M., who was 18 years old when the trial took place. She testified that N.M. is her half-sister and the defendant is her father. She testified that between 2006 and 2009, she occasionally visited her father at the house on 81st Street. She said that when she visited her father, he drank alcohol heavily. I.M. testified that she rarely saw N.M. and could remember only a single occasion when they both spent the night at the same house, which she |isrecalled occurring some time in 2008. I.M. testified that when Detective Woodfork called her, she did not report any inappropriate sexual behavior by the defendant, and instead described staying up that night and talking to N.M. I.M. did not recall telling Detective Woodfork that the defendant entered the room where she and N.M. slept that night. I.M. denied telling Detective Woodfork that the defendant touched her feet as well as N.M.’s feet that night. She said that although she “occasionally” spoke with her father after his arrest, she did not discuss the criminal charges pending against him. I.M. stated that she did not want to testify against her father.
Following I.M.’s testimony, Detective Woodfork was recalled to the stand by the State. She testified that in October 2009, she spoke with I.M. and I.M. remembered an incident when she and N.M. slept in the same bed and the defendant entered the room late at night. Detective Woodfork testified that I.M. recalled the defendant rubbed her legs or feet, and he then touched N.M. Detective Woodfork said I.M. maintained that she had fallen asleep, *658 and that she did not recall the defendant having sexual intercourse with N.M. The detective included this information in her police report.
The State’s final witness was Dr. Jamie Jackson, who was accepted as an expert in the field of child abuse pediatrics and forensic pediatrics. Dr. Jackson testified that children may delay disclosing incidents of sexual abuse because they lack knowledge that it is inappropriate or because of internal or external factors. As examples of internal or external factors, she said the child might feel partially to blame for what happened and fear that if he told anyone, people might not believe him. Dr. Jackson also explained that the child might be afraid of the person and fear the person might retaliate against him, or the child might be fearful that if he told, the abuser might not be around any longer to provide for him financially. Dr. 114Jackson stated that she did not know the victims in this case, nor did she treat or interview them, and she did not review any documents in this case.
Dr. Jackson testified that a child is more likely to disclose if the abuser is a stranger; if the child has a familial relationship with the abuser, the child is less likely to disclose soon after the incident. She asserted that 20 to 25 percent of perpetrators are biological parents, and that 90 percent of the time, it is someone very close to the family or the child. Dr. Jackson testified that delayed disclosure was very common and that many children gradually disclose. She explained that when disclosing, children may get the acts out of order when the abuse occurs over a long period of time. Lastly, Dr. Jackson testified that 90 to 95 percent of the time there is no physical evidence on most children who are sexually abused.
The sole witness for the defense was the defendant himself. He testified that he lived in Louisiana from the time he was five years old until he was 18 years old. During that time, he met T.M. and she became pregnant with their daughter, N.M. He subsequently enlisted in the Navy, left Louisiana, and did not return for twelve years. The defendant testified that he returned to Louisiana in 2005 and worked as a commercial diver. He admitted to having two previous convictions for drug-related offenses.
The defendant denied that he had sex with or raped either K.P. or N.M.
According to the defendant, there was “a lot of conflict” between himself and T.M., in part because of his lack of involvement as a father, and in part because he impregnated another girl shortly after N.M. was born.[5] The defendant testified that T.M. did not want N.M. to have a relationship with him, and refused to allow N.M. to sleep over his house until N.M. begged, threatened, and argued with her.
1 ]5 According to the defendant, N.M. was jealous of the financial support that he provided to I.M., and she argued with him about money. He testified he never offered N.M. alcohol or drugs. The defendant suggested that the charges against him were fabricated by N.M. because she was angry about his lack of financial support. He opined that N.M. was making these allegations out of animosity for years of being scorned.
The defendant attacked KP.’s veracity as a witness. He claimed that K.P. was not living at his grandmother’s house in 1990, although he conceded that her mother and her sister, T.M., were living there. He testified that he had no “beef’ with K.P. and he said she made these allegations because she had no morals. He ex *659 plained that K.P. used her maiden name despite being married, did not work, and it would not be a problem for her to lie for a cause that her sister might be interested in.
During cross-examination, the defendant denied being intoxicated during visits with his children, and denied being asked to leave his mother’s house because of substance abuse. He recalled some of the same occasions that N.M. had testified about, including watching movies on the couch with her and taking her to the rocky area near Lake Pontchartrain. However, he denied raping her on either occasion.
He admitted that between 2006 and 2008, he might have rented a room at the hotel located on Williams, but he denied taking N.M. to that hotel. He explained that he stayed at that hotel three or four times because he had female companions he did not want to take to his mother’s house. The defendant admitted taking N.M. to a nightclub when she was 15 years old, but he explained that it was a private birthday party and that minors were not allowed to have alcohol.
11i;The defendant testified that he used to watch movies with N.M., and he remembered the night they watched the movie Robots. However, he denied having sex with N.M. that night, and he denied saying it would be good practice for her. The defendant denied going into the bedroom and rubbing the legs of N.M. or I.M., and he denied ever going into their bedroom after they went to sleep.
We discuss the appeal and the writ application separately.

APPEAL

ASSIGNMENT OF ERROR NUMBER ONE
The defendant asserts the district court committed reversible error in accepting the jury’s guilty verdict, when the three women in this case had no physical evidence or eyewitnesses to support their allegations that he raped two under-aged girls while in the house with other adults.
The defendant argues that the evidence was insufficient to support the three verdicts. He contends that K.P., N.M., and N.M.’s mother, T.M., conspired against him by testifying that he raped, molested, and committed incest against K.P. and/or N.M. He claims they lied because he refused to forward any more money to N.M. or because T.M. still had lingering bitterness due to his abandonment of her and their daughter. The defendant asserts that there was no corroborating evidence and that the jury convicted him because of its overwhelming sympathy and compassion for N.M., who at the time of trial was recently married and pregnant, and had been ignored by her father for the first 15 years of her life.
The State responds that the evidence was constitutionally sufficient to establish defendant’s guilt beyond a reasonable doubt.[6]
[17In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the ele *660 ments of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”’ La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83; State v. Washington, 03-1135, p. 4 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’ testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Turner, 05-75, pp. 11-12 (La.App. 5 Cir. 5/31/05), 904 So.2d 816, 823, writ denied, 05-2591 (La.5/26/06), 930 So.2d 20. The victim’s testimony alone can be sufficient to establish the elements of a sexual offense, even if the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. State v. Hotoph, 99-243, p. 13 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062, and 00-0150 (La.6/30/00), 765 So.2d 1066.
Count 1 — Attempted Indecent Behavior with a Juvenile (K.P.)
The indictment alleged that on or between April 1 and May 31,1990, the defendant violated La. R.S. 14:42 in that he committed aggravated rape upon a known juvenile (DOB 10/12/1980), wherein the victim was under the age of 12. However, the defendant was convicted of attempted indecent behavior with a juvenile in violation of La. R.S. 14:81 and 14:27 (count 1), which was listed in the verdict form as a responsive verdict.
In 1990, at the time the alleged offenses occurred, La. R.S. 14:81 provided in pertinent part:
A. Indecent behavior with juveniles is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person. Lack of knowledge of the child’s age shall not be a defense.[7]
A lewd or lascivious act is one which tends to excite lust and to deprave the morals with respect to sexual relations and which is obscene, indecent, and related to sexual impurity or incontinence carried on in a wanton manner. State v. Stec, 99-633, p. 6 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787; State v. Holstead, 354 So.2d 493, 497-498 (La.1977).
La. R.S. 14:27, Louisiana’s attempt statute, provides in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his *661 object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the 1^circumstances, he would have actually accomplished his purpose.
The record reflects that the defendant committed several lewd and lascivious acts on the victim with the intention of arousing or gratifying his sexual desires. K.P. testified that in 1990, when she was nine years old and not yet ten, the defendant took off her clothes and began touching her chest and private area. The defendant then got on top of K.P. and attempted several times to force his erect penis into her vagina, but was unsuccessful. The record also reflects that the defendant was 15 years old at the time of this incident, since the prosecution and the defense stipulated that the defendant’s date of birth was October 18, 1974, and KP.’s date of birth was October 12, 1980. Because La. R.S. 14:81 in 1990 required the acts to be committed by a person over the age of 17, it does not appear that all of the elements of attempted indecent behavior with a juvenile were proven beyond a reasonable doubt.
Nevertheless, an appellate court will not reverse a jury’s return of a responsive verdict, whether or not supported by the evidence, as long as the evidence is sufficient to support a conviction for the charged offense. State v. Merrill, 12-576, p. 8 (La.App. 5 Cir. 12/27/12), 105 So.3d 264, 270 (citing State v. Harris, 02-1589, p. 4 (La.5/20/03), 846 So.2d 709, 712-13).
The defendant was indicted with violation of La. R.S. 14:42, aggravated rape. In 1990, La. R.S. 14:42 provided in pertinent part:
A. Aggravated rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
[[Image here]]
(4) When the victim is under the age of twelve years[.]
In 1990, rape was defined as follows:
| 2qA. Rape is the act of anal or vaginal sexual intercourse with a male or female person who is not the spouse of the offender, committed without the person’s lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
The State presented evidence to show that the defendant raped K.P. within the meaning of La. R.S. 14:42(A) and (B). K.P. testified that the defendant took off her clothes and then attempted several times to force his erect penis into her vagina, “skin to skin.” La. R.S. 14:42(B) states that any sexual penetration, however slight, is sufficient to complete the crime. Additionally, K.P. testified that she was nine years old at the time of the incident and, therefore, she was under the age of 12 years, as required by La. R.S. 14:42A(4).
Although the defendant denied raping K.P., the jury obviously found the State’s witnesses to be more credible. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
Accordingly, we find that a rational trier of fact could have found the evidence was sufficient under the Jackson standard to support a conviction of aggravated rape, the charged offense. Therefore, the re *662 sponsive verdict of attempted indecent behavior with a juvenile is not reversible error.
(Count 2) — Molestation of a Known Juvenile (N.M.)
The amended indictment alleged that on or between February 1, 2006 and March 22, 2008, the defendant violated La. R.S. 14:81.2 in that he, having a position of control or supervision over the known juvenile, (DOB 3/23/1991), and |2tbeing two years older than the known juvenile, did commit a lewd and lascivious act upon the known juvenile, for greater than one year, by penile/vaginal intercourse. The defendant was convicted as charged of molestation of a juvenile (count 2).
La. R.S. 14:81.2 provides in pertinent part:
A. (1) Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile’s age shall not be a defense.
In the instant case, N.M. testified that the acts were inflicted on her from age 14 to age 17, between 2006 and 2008. The State and the defense stipulated that N.M.’s date of birth is March 23,1991, and the defendant’s date of birth is October 18, 1974. Clearly, N.M. was under the age of 17 and there was an age difference of greater than two years between N.M. and the defendant, as required by La. R.S. 14:81.2(A)(1).
In addition, the record reflects that the defendant committed several lewd and lascivious acts on the victim with the intention of arousing or gratifying his sexual desires. N.M. testified that the defendant penetrated her vaginally with his penis on numerous occasions at her grandmother’s house, in his car, by Lake Pontchartrain, and at a hotel. The record shows that the defendant performed these acts by virtue of his position of control or supervision over N.M. as her father. La. R.S. 14:81.2(A)(1).
12!>,Although the defendant denied performing these acts, the jury obviously found the State’s witnesses to be credible and rejected the defendant’s denials. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. Rowan, supra.
Considering the foregoing, we find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support defendant’s conviction of molestation of a juvenile.
(Count 3) — Aggravated Incest (N.M.)
The indictment alleged that on or between March 23, 2008 and March 22, 2009, the defendant violated La. R.S. 14:78.1 in that he committed aggravated incest upon a known juvenile (DOB 3/23/1991), who was the defendant’s daughter, by oral copulation and penile/vaginal intercourse. The defendant was convicted as charged of aggravated incest (count 3).
At the time the incidents occurred between 2006 and 2008, La. R.S. 14:78.1 provided in pertinent part:
A. Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under *663 eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child....
B. The following are prohibited acts under this Section:
(1) Sexual intercourse, sexual battery, second degree sexual battery, carnal knowledge of a juvenile, indecent behavior with juveniles, pornography involving juveniles, molestation of a juvenile, crime against nature, cruelty to juveniles, parent enticing a child into prostitution, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.
| ¾⅝(2) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.
In the instant case, N.M.’s testimony reflects that she was under 18 years of age when the incidents occurred, as required by La. R.S. 14:78.1(A). The State and the defense stipulated that the defendant was the biological father of N.M., also as required by that statute. In addition, as previously discussed, N.M. testified that the defendant engaged in sexual intercourse with her on numerous occasions.
Although the defendant denied performing these acts, the jury obviously found the State’s witnesses to be credible and rejected the defendant’s denials.
The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. Rowan, supra.
In light of the foregoing, we find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support the defendant’s conviction of aggravated incest.
ERROR PATENT DISCUSSION
The record was reviewed for errors patent, pursuant to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals several potential patent errors.
1. Arraignment on Amended Charge
As was stated previously, the State amended count 2 of the indictment to show that the date of the offense was on or between February 1, 2006, and March 22, 2008. Defense counsel stated that he had no objection to the amendment; however, the defendant was not re-arraigned after the State amended the indictment. Since the defendant proceeded to trial without objection, he waived | a4any irregularity. La.C.Cr.P. art. 555; State v. Warmack, 07-311, pp. 8-9 (La.App. 5 Cir. 11/27/07), 973 So.2d 104, 109.
2. Responsive Verdict/Count 1
At the time of trial in 2011, attempted indecent behavior with a juvenile was a legislatively responsive verdict to aggravated rape of a child under the age of 13, and it was included on the list of responsive verdicts for the jury. La.C.Cr.P. art. 814(A)(8.1). However, in 1990, at the time of the alleged offenses, there were no responsive verdicts for “aggravated rape of a child under the age of 13,” and attempted indecent behavior with a juvenile was not a responsive verdict for aggravated rape.
In State v. Hubbard, 08-1000, 2009 WL 533093, at *3-4 (La.App. 3 Cir. 3/4/09) (unpublished opinion), the defendant asserted that the trial court erred in *664 giving charges to the jury that included four improper responsive verdicts, including guilty of attempted indecent behavior with a juvenile. The defendant argued that those offenses were not responsive to aggravated rape under La.C.Cr.P. art. 814 as it read in 2006. However, defense counsel voiced no objection to the jury instructions or the verdict form at trial. On appeal, the third circuit found that in the absence of a contemporaneous objection, this issue could not be raised on appeal. In addition, the Louisiana Supreme Court has held that the issue of improper responsive verdicts must be raised by contemporaneous objection, and it is not a patent error reviewable on the face of the pleadings. State v. Turner, 337 So.2d 1090, 1091 (La.1976).
In the instant case, the trial court erred in giving four improper responsive verdicts on Count 1 — guilty of molestation of a juvenile, guilty of attempted molestation of a juvenile, guilty of indecent behavior with a juvenile, and guilty of attempted indecent behavior with a juvenile — since they were not responsive to aj^charge of aggravated rape in La.C.Cr.P. art. 814 as it read in 1990. See Hubbard, supra. Further, since the defendant was under the age of 17 at the time of the alleged incidents, it does not appear they were responsive.
Neither the defendant nor the State raised this issue on appeal. Defense counsel did not voice any objection to the jury instructions or the verdict form at trial. Therefore, this issue could not have been raised on appeal, and it is not an error patent. See Turner, supra.
3. Sex Offender Registration
The record does not reflect that the defendant was notified of the sex offender and child predator registration requirements for his convictions of attempted indecent behavior with a juvenile, molestation of a juvenile, and aggravated incest. La. R.S. 15:540-15:553 require registration of sex offenders, and La. R.S. 15:543(A) requires the trial judge to provide written notification of the registration requirements of La. R.S. 15:542 and 15:542.1 to the defendant. The trial court’s failure to provide this notification constitutes error patent. State v. Morgan, 06-529, pp. 23-24 (La.App. 5 Cir. 12/12/06), 948 So.2d 199, 213-114. Therefore, we shall remand the matter and instruct the district court to notify the defendant of the sex offender registration requirements and the child predator registration provisions, and to furnish the record with proof of such notice to defendant. Id.
4. Multiple Bill-Admit/Deny Hearing
The State filed a multiple bill alleging the defendant to be a third felony offender; however, the record does not reflect that the court held an admit/deny hearing on the multiple bill. The record also does not reflect that the defendant objected to the lack of such a hearing. This Court has previously held that a defendant waives his right to admit or deny the allegations in the multiple bill |2fiWhen he proceeds to the multiple bill hearing without objecting. State v. Jerome, 03-126, p. 3 (La.App. 5 Cir. 4/29/03), 845 So.2d 1194, 1196. Accordingly, we find that because the defendant proceeded to the multiple bill hearing without objecting, he waived his right to admit or deny the allegations in the multiple bill. Moreover, the fact that the defendant filed a written response to the multiple bill indicates that he was aware of the allegations contained therein. See State v. Packnett, 03-1446, p. 8 (La.App. 5 Cir. 4/27/04), 873 So.2d 789, 793-94, writ denied, 04-2559 (La.6/24/05), 904 So.2d 736.
*665 5. Multiple Offender Rights
La. R.S. 15:529.1 requires the trial court to advise a defendant of the allegations contained in the information, his right to a hearing, and his right to remain silent. State v. Haywood, 00-1584, p. 19 (La.App. 5 Cir. 3/28/01), 783 So.2d 568, 582. The record in this case does not disclose that the defendant was advised of his rights prior to the multiple bill hearing. The failure of the trial court to advise a defendant of his right to a trial and to remain silent is harmless error when the multiple offender status is established by competent evidence offered by the State at a hearing, rather than by the admission of the defendant. Id. Here, the defendant proceeded to the multiple bill hearing, and the State presented competent evidence at the hearing to establish his multiple offender status. Hence, the trial court’s failure to advise him of the specific allegations against him and of his right to be tried and to remain silent was harmless error.

WRIT APPLICATION

In its writ application, the State argues that the trial judge erred by finding the defendant to be a second felony offender rather than a third felony offender.
|a7On March 19, 2012, the State filed a habitual offender bill alleging the defendant to be a third felony offender. The underlying offense was the September 30, 2011 conviction of aggravated incest (La. R.S. 14:78.1), discussed above. The two predicate convictions were (1) a guilty plea on July 9,1999 to delivery of cocaine (ORS 475.992) in Washington County, Oregon, ease number C972832CR, and (2) a guilty plea on May 26,1998 to delivery of cocaine (ORS 475.992) in Multnomah County, Oregon, case number C9802-31342. The defendant filed a response to the multiple bill on March 20, 2012.
Multiple bill hearings were held on May 14, June 21, August 20, and August 23, 2012. On May 14, 2012, the State and the defense stipulated to the defendant’s identity in the Oregon cases. The State then introduced State’s Exhibit 1 (documents pertaining to the Multnomah County guilty plea), State’s Exhibit 2 (documents pertaining to the Washington County guilty plea), and State’s Exhibit 3 (a Boykin form and a copy of the indictment from the Washington County conviction), which the trial judge admitted into evidence.
The prosecutor argued that the exhibits showed the defendant was a third felony offender. Defense counsel responded that the Multnomah County documents contained only an indictment and a commitment, which did not include any of the necessary rights other than the fact that the defendant was represented by counsel and sentenced. He argued there was no evidence to show that the defendant was advised of his necessary rights at the time of the Multnomah County guilty plea and, therefore, the State had only demonstrated that the defendant was a double-bill and not a triple-bill.
The prosecutor responded that State’s Exhibits 1 and 2 showed that the defendant was represented by counsel at the time of the guilty plea and was advised of his rights. He also responded that there was a presumption of regularity l^with regard to certified documents. The prosecutor asked the trial judge to hold the hearing open so he could have witnesses flown in from Oregon. The trial judge agreed to the continuance.
On June 21, 2012, the prosecutor introduced State’s Exhibit 4, a certified conviction packet from Multnomah County, Oregon; State’s Exhibit 5, a certified conviction packet from Washington County, Oregon; and State’s Exhibit 6, a certified packet from the Secretary of *666 State’s Office in Oregon certifying the relevant statutes at issue. The prosecutor argued that those exhibits should satisfy the court that the defendant was represented by counsel in both Oregon pleas, and he asked the court to find the defendant to be a third felony offender, vacate the sentence on count 3, and resentence the defendant under the multiple bill statute to life imprisonment.
Defense counsel replied that State’s Exhibits 4 and 5, to some degree, were dupli-cative of State’s Exhibits 1 and 2. He admitted that with respect to the Washington County plea, the three-page document entitled, “Petition to enter a plea of guilty in Case C 97-2832 CR,” showed that the defendant was represented by counsel and was advised of his Boykin rights as pertained to that conviction. Defense counsel argued that State’s Exhibit 4, the Multno-mah County documents, showed that the petition to plead guilty listed the defendant’s rights and was signed by the defendant and his attorney, but not by the judge. He contended there was nothing in that document that showed the advisory of rights was done in open court before a judge, and he noted there was no minute entry or judgment or transcript of a proceeding. Defense counsel argued alternatively that there was no demonstration that delivery of a controlled dangerous substance was analogous to distribution of cocaine. •
12sAfter hearing arguments of counsel and reviewing the exhibits, the trial judge continued the hearing to allow both sides to submit memoranda on the issue of whether the waiver of constitutional rights had to be conducted and verified in front of a judge. The trial judge added that with respect to the other issue, he felt that distribution of cocaine and delivery of cocaine were similar crimes for purposes of the multiple bill.
On August 20, 2012, the prosecutor stated that defense counsel had filed a memorandum in support of his position. That memorandum is not contained in the record on appeal, nor is it attached to the writ application. The prosecutor also introduced two more exhibits, State’s Exhibit 7, a sworn affidavit by Mary Cook, the court reporter present when the defendant pleaded guilty in Multnomah County, Oregon, which was notarized in Oregon; and State’s Exhibit 8, a certified copy of the sworn testimony of the defendant during the instant trial, which were admitted into evidence.
On August 23, 2012, the trial judge found that the State met its burden of proving the Washington County, Oregon guilty plea. With respect to the Multno-mah County guilty plea, however, the trial judge said that the documents the State relied upon did not convince the court that there was enough evidence to support the State’s position that a judge properly advised the defendant of the specific rights he waived. The trial judge stated that the normal requirement would be proof of a colloquy between the judge and the defendant, but here the waiver form was not signed by the judge and did not show that the defendant was advised of his rights by a judge through a judge’s signature on that waiver form. The trial judge did not believe the affidavit of the court reporter cured any of those deficiencies. He noted the affidavit did not recite that the court reporter had an ^independent recollection of the hearing or that she was present when the judge had a dialogue with the defendant.
The trial judge also asserted that the Multnomah hearing took place on May 26, 1998, according to the signature block signed by the defendant and his attorney, but that the judge’s signature on the form entitled “Money Judgment” was not signed *667 until June 9, 1998, which called into question whether the trial judge was present and properly advised the defendant of his rights. In sum, the trial judge determined that the State had not proven the defendant was a triple-bill offender, but it did prove the defendant was a double-bill offender.
Afterward, the trial judge vacated the original sentence on count 3, aggravated incest, and re-sentenced the defendant to thirty years in the Department of Corrections, without benefit of probation or suspension of sentence.
In the writ application the State contends the exhibits show that the defendant was properly advised of his Boykin[8] rights during the guilty plea colloquy in Multno-mah County, Oregon and, therefore, that predicate offense should have been used in finding the defendant to be a third felony offender.
To prove a defendant iá á habitual offender, the State must initially prove that there were prior felony convictions and that the defendant is the same person who was convicted of the prior felonies. State v. Thomas, 06-654, p. 7 (La.App. 5 Cir. 1/16/07), 951 So.2d 372, 378, writ denied, 07-464 (La.11/21/07), 967 So.2d 1153.
When the State relies on a prior conviction based on a guilty plea to prove the defendant’s habitual offender status and the defendant denies the habitual offender bill, the State’s burden of proof is governed by State v. Shelton, 621 So.2d 769, 779-80 (La.1993). Under Shelton, the State has the initial burden to prove |s1the existence of the prior guilty pleas and that the defendant was represented by counsel when the pleas were taken. If the State satisfies that burden, the burden shifts to the defendant to produce affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. Id. If the defendant makes such showing, the burden of proving the constitutionality of the plea shifts to the State. Id. This burden is met if the State produces a “perfect” transcript of the guilty plea, i.e., one which reflects a colloquy in which the judge informed the defendant of, and the defendant waived his right to trial by jury, his privilege against self-incrimination, and his right of confrontation. Id.
If the State introduces anything less than a “perfect” transcript, such as a guilty plea form, a minute entry, an “imperfect” transcript, or any combination thereof, the judge must weigh the evidence submitted by each party to determine whether the State has met its burden of proving the prior guilty plea was “informed and voluntary, and made with an articulated waiver of the three Boykin rights.” Shelton, 621 So.2d at 780.
In Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), the United States Supreme Court emphasized three federal constitutional rights that are waived by a guilty plea: the privilege against self-incrimination, the right to a trial by jury, and the right to confront accusers. State v. Davis, 03-488, p. 7 (La.App. 5 Cir. 11/12/03), 861 So.2d 638, 642, writ denied, 03-3401 (La.4/2/04), 869 So.2d 874. Under Boykin, the decision to plead guilty will not be considered voluntary unless, at the very least, the defendant has been advised of his privilege against self-incrimination and his rights to a trial by jury and confrontation. State v. Payton, 04-1024, p. 4 (La.App. 5 Cir. 1/11/05), 894 So.2d 362, 365. The record must also show the defendant freely and voluntarily waived those rights. Id.
*668 |S2We found no cases directly on point, but the following cases provide guidance. In State v. Pertuit, 98-1264 (La.App. 5 Cir. 4/27/99), 734 So.2d 144, and State v. Dejean, 94-459 (La.App. 5 Cir. 11/28/95), 694 So.2d 284, writ denied, 96-547 (La.5/17/96), 673 So.2d 608, this Court found that the evidence was insufficient to show the vol-untariness of the defendants’ guilty pleas. On the other hand, in State v. Perkins, 99-1084 (La.App. 5 Cir. 1/25/00), 751 So.2d 403, writ denied, 00-656 (La.12/15/00), 777 So.2d 476, this Court found the evidence was sufficient to show the voluntariness of the defendant’s guilty plea.
Pertuit involved a waiver of rights form not signed by all parties, and a transcript that did not show the trial judge advised the defendant of his rights. The defendant was charged with fourth offense DWI, after which he filed a motion to quash the bill of information. He alleged that his 1993 conviction could not be used as a predicate offense because he had not been properly informed of his constitutional rights before entering that guilty plea. The trial court granted the motion, and the State appealed. This Court stated that the transcript of the 1993 conviction showed the trial judge did not advise the defendant of any rights prior to accepting the plea. It also stated that the transcript contained a statement by the defendant’s attorney that he had executed a Boykin form that he gave to the court at that time.
In its opposition to the motion to quash in Pertuit, the State attached a copy of the waiver of rights form executed in connection with the 1993 guilty plea; however, that form was signed by the defendant and the assistant district attorney, but not by the defendant’s attorney or the trial judge. This Court found that evidence was not sufficient to prove the defendant knowingly and voluntarily waived his rights prior to entering the challenged guilty plea. It stated that a guilty plea waiver of rights form, even if well-executed in every detail, without minutes l.^or a transcript of the plea, was not sufficient to show a knowing and voluntary waiver of Boykin rights. Pertuit, 98-1264 at 2-4, 734 So.2d at 146-147.
Dejean involved a waiver of rights form signed by all parties, but there was no minute entry for the guilty plea proceedings and no transcript showing a colloquy between the defendant and the trial judge. This Court found that the defendant’s guilty plea was invalid because there was not sufficient proof as to his knowing and voluntary waiver of his constitutional rights prior to the entry of his guilty plea. We noted there was a waiver of rights form indicating that the defendant was represented by an attorney and that the attorney advised the defendant of his rights. The waiver of rights form was signed by the defendant, his attorney, and the trial judge. However, there was no minute entry contained in the record for the guilty plea proceedings, nor was there a transcript that showed a colloquy between the defendant and the trial judge concerning the defendant’s guilty plea and the waiver of his constitutional rights. In fact, the guilty plea was not handled in open court. Other than the waiver of rights form, the only mention in the record of the defendant’s rights was in the hard labor sentencing form. It stated that the court advised the defendant of his rights, which the defendant waived. Dejean, 94-459 at 3-5, 694 So.2d at 286-287.
Perkins involved a waiver of rights form not signed by the trial judge and a minute entry detailing the colloquy between the defendant and the trial judge regarding the defendant’s rights. The defendant argued that the evidence presented at the multiple bill hearing was insufficient because the trial judge failed to sign the *669 waiver of rights form for the predicate offense. This Court found that although the waiver of rights form was not signed by the trial judge, the form clearly articulated the waiver of the defendant’s Boykin rights and was signed and initialed by the defendant and his attorney. This Court also found that the entire record in the case, |S4combining the waiver form and the minute entry detailing the colloquy between defendant and the trial judge, supported the fact that the defendant knowingly and voluntarily waived his rights. Perkins, 99-1084 at 4-6, 751 So.2d at 407-408.
In this case, with respect to the Multnomah County guilty plea at issue in this writ application, the State introduced State’s Exhibit 4, which contains the indictment of defendant for a violation of ORS 475.992, delivery of a controlled dangerous substance (cocaine). That exhibit also contains a Petition to Plead Guilty/No Contest and Waiver of Jury Trial, which sets forth that the defendant understood he had the right to a jury trial, the right to remain silent, the right to see, hear and cross-examine or question all witnesses who testified against him at trial, and that the defendant understood that he was giving up all of those rights when pleading guilty.
State’s Exhibit 4 next contains a document stating that the trial court was advising defendant of his right to appeal. That document was signed by defendant and his attorney on May 26, 1998. Following that document in State’s Exhibit 4 is a four-page document. Page 1 is titled “Judgment of Conviction and Sentence,” and is dated May 26, 1998. Page 2 is titled “Disposition,” and sets forth the defendant’s sentence of 36 months. Page 4 is titled “Money Judgment”; it lists the fees and fines the defendant must pay, and is signed by Judge Roosevelt Robinson. The signature is dated June 9, 1998, but the form states “nunc pro tunc” May 26, 1998.
The prosecution also introduced State’s Exhibit 7, an affidavit from Mary Cook, which states that she served as a court reporter for Judge Robinson from 1997 to 2002, that she reviewed Exhibit B (the Judgment of Conviction and Sentence, the Disposition, and the Money Judgment) with the judge’s signature at the end, that those pages were to be construed as one continuous and complete |35document; and that the judge was not required to sign every page of the document for it to be valid. The affidavit stated further that under Oregon statutes, Exhibit A (the plea petition) and Exhibit B together were considered a record of a conviction and sentence, and that Judge Robinson would have been present for all proceedings relating to both exhibits, as evidenced by his signature at the end of Exhibit B. The affidavit concluded by stating that Ms. Cook, Judge Robinson, the prosecutor, the defendant, and defendant’s counsel were present for all proceedings relating to both exhibits. Mary Cook’s affidavit does not, however, contain any specific facts to establish she recalled the defendant’s particular case.
Lastly, the prosecution introduced State’s Exhibit 8, a transcript of the defendant’s testimony in the current case, in which he admitted that he had two drug convictions in 1998 and 1999 in Oregon.
After reviewing those exhibits and the applicable law, we find that the State proved the existence of the Multnomah County plea and proved that the defendant was represented by counsel at that time. The burden then shifted to the defendant to show a procedural irregularity in the taking of the plea, and he did show such an irregularity: namely, that the exhibits failed to show he was advised of his rights and waived them. Although the State pro *670 duced some evidence showing that the constitutional rights of the defendant were protected, it was within the trial court’s discretion under Shelton to weigh the evidence submitted during the multiple bill hearings.
The Oregon plea petition, which is similar’ to Louisiana’s waiver of rights form, was signed by the defendant and his attorney; however, it was not signed by the trial judge. See Pertuit, supra. In addition, there is no transcript of the plea proceedings, nor is there a minute entry showing a colloquy between the trial judge and the defendant concerning the defendant’s guilty plea and the waiver of his |;sbconstitutional rights. See Dejean, supra. A guilty plea waiver of rights form, even if well-executed in every detail, without minutes or a transcript of the plea, is not sufficient to show a knowing and voluntary waiver of Boykin rights. See Pertuit, supra.
We find no abuse of the trial court’s discretion in determining that the State did not present sufficient evidence to show that the defendant was properly advised of his constitutional rights and knowingly and voluntarily waived them .prior to entering the Multnomah County guilty plea. Accordingly, we decline to disturb the ruling of the district court that found the defendant a second-felony offender. The writ application is denied.
DECREE
For the foregoing reasons, the convictions are affirmed and the sentences are affirmed. The writ application is denied. The matter is remanded and the district court is instructed to notify the defendant of the sex offender registration requirements and the child predator registration provisions within 10 days of rendition of this opinion, and to file written proof in the record that the defendant received the notice.

CONVICTIONS AND SENTENCES AFFIRMED; WRIT DENIED; CASE REMANDED

. In the interest of protecting minor victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), the judges of this Court have adopted a policy that this Court's published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim’s identity (i.e., parent, sibling, or relative with the same last name as the victim). Compare State v. R.W.B., 12-453 (La. 12/4/12), 105 So.3d 54.

. Although the appellate record does not contain any minute entries dated June 21, August 20, or August 23, 2012, regarding the multiple bill hearings or the sentencing on the multiple bill, the record does include transcripts of those hearings.

. The house previously was the defendant’s grandmother’s, but after his grandmother died it became the defendant’s mother’s home.

. His initials are also N.M.

. This relationship resulted in the birth of I.M.

. The defendant also argues that N.M.’s additional allegations of sexual abuse should not have been admitted at trial due to their last-minute disclosure. The State responds that defendant has abandoned any argument in this respect because he failed to brief this issue. The defendant did not brief this issue and, therefore, we consider it abandoned. See Uniform Rules — Courts of Appeal, Rule 2-12.4; State v. Tranchant, 10-459, p. 9 (La.App. 5 Cir. 11/23/10), 54 So.3d 730, 735, writ denied, 10-2821 (La.4/29/11), 62 So.3d 108.

. We note that the jury was charged with the 1990 version of this statute.

. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).